## WASHINGTON WATER POWER CO. v. CITY OF COEUR D'ALENE, IDAHO, et al.
### No. 1268.

District Court, D. Idaho, N. D.
Dec. 13, 1934.

John P. Gray, W. F. McNaughton, and Robert H. Elder, all of Coeur d'Alene, Idaho, for plaintiff.

W. B. McFarland and C. H. Potts, both of Coeur d'Alene, Idaho, for defendants City of Coeur d'Alene, officers and City Council of said city.

Henry T. Hunt, Sp. Asst. to Atty. Gen., and John A. Carver, Dist. Atty., and E. H. Casterlin and Frank Griffin, Asst. Dist. Attys., all of Boise, Idaho, for defendant Harold L. Ickes, Federal Emergency Administrator of Public Works.

CAVANAH, District Judge.

The Washington Water Power Company engaged in generation and sale of electrical energy in the state of Idaho, and as a franchise holder and taxpayer in the city of Coeur d'Alene, brings this suit against the city and certain of its officers and the Administrator of the Federal Emergency Administration of Public Works to restrain their issuing, pledging, and selling certain bonds of the city and accepting and applying any loan or grant from the Federal Emergency Administration of Public Works for the construction of a municipal Diesel engine generating plant and electrical distribution system, and challenges the validity of the plan and proceedings upon the grounds that they are violative of the Fifth, Tenth, and Fourteenth Amendments of the Constitution of the United States and of section 3, article 8, of the Constitution of the State of Idaho, in that they deprive the plaintiff of its property without due process of law and an unlawful invasion of power reserved to the states and not delegated to the United States when enacting the National Industrial Recovery Act (48 Stat. 195), and that no power is granted to Congress to make a loan or grant of moneys of the United States to the city for the purpose of constructing the plant, and that the loan and grant involved are in excess of and outside the scope of the National Industrial Recovery Act, as they constitute the financing by the federal government of a purely local proprietory business.

The foundation of jurisdiction is the diversity of citizenship and a controversy arising under the Constitution and laws of the United States.

The defendants have moved to dismiss the bill, and we are confined to the averments of it, which are voluminous, when solving the questions presented. The essential facts as averred are: That the plaintiff is authorized to engage in the generation and distribution of electrical energy and as a public service corporation owns a hydroelectric power plant situated in the Spokane river at Post Falls, Idaho, about ten miles from the city of Coeur d'Alene, and several other plants situated on the river in the state of Washington, for the purpose of furnishing service to many of its customers and users of power in Northern Idaho and Eastern Washington, and are furnishing and do render electrical service to the territory in Idaho under authority of the Public Utilities Commission of the State; that it has

expended more than $5,000,000 in the construction and improvement of its electrical facilities in Idaho, and has issued and has outstanding bonds and stocks and a substantial portion of its stocks have been sold to its customers and employees and other citizens residing in the territory in which it operates; that its net earnings have been decreased very substantially during the years of the depression by reason of taxes and operating expenses.

On October 19, 1903, the village of Coeur d'Alene, predecessor of the city, granted to the predecessor in interest of the plaintiff a franchise for furnishing, to the inhabitants of the village, electricity for lighting and other purposes for a period of fifty years. In 1930, the plaintiff purchased the system and operated it. Since acquiring it the plaintiff has expended more than $33,000 in improvement and reconstruction of the system, and $27,000 for installation of new transformers.

The rates charged for such service in Idaho are subject to regulation and control by the Public Utilities Commission of the state.

The city has a population of 8,297, and plaintiff does and its predecessor in interest has for more than thirty years furnished electrical service to all classes of customers in the city who number 2,377 and 332 additional customers residing in territory adjacent to the city. The investment plaintiff has in the city is more than $200,000, and it pays taxes to the government, state, county, and city in large amounts.

On November 2, 1933, the city enacted an ordinance calling for an election for the purpose of submitting to the voters the proposition of the issuance of municipal bonds of $300,000 for the purpose of paying the costs and expenses of acquiring, by purchase or construction, a light and power plant and distribution system, and at the same time it also adopted an ordinance providing for the issuance of municipal bonds of $300,000 to pay the costs and expenses of acquiring, by purchase or by construction, a water system. The election was held submitting for approval the two propositions, which resulted in their approval by more than two-thirds vote. After the city council declared that the bond election had carried, it authorized the proper officers of the city to prepare an application to be made to the Federal Administration of Public Works for funds to construct the water system and light and power plant in the city. Pursuant to the direction of the council, the officers of the city, on December 14, 1933, filed with the Federal Administration of Public Works application wherein a loan was requested of $650,000, and a net loan of $475,000, which is alleged to exclude a 30 per cent. grant for the cost of labor and materials to be used in the construction of the electric and water systems. In the application it is stated that the total cost of the electric distribution and street lighting system is estimated to be $337,580, which is in excess of the amount of indebtedness authorized to be incurred for the purpose mentioned in the ordinance and the election held pursuant to the ordinance. Of the sum of $337,580 the total cost of labor and material is estimated at $276,512.91, and the contractor's profit thereon at $27,578.09, a total of $304,091, and other costs are estimated to be $44,480. Protest against the approval of the application was filed by the plaintiff with the Federal Administration of Public Works, but it was approved by the Administrator in the amount of $337,580 for the electrical system, of which sum part is to be a loan and part a grant. The city intends to enter into a contract, which it has already executed, with the Federal Administrator of Public Works for $337,580 and to issue and pledge its general obligation bonds as security for the amount of the loan and will construct the electrical system. Further it is alleged that the acts of the defendants will incur an indebtedness and create a liability exceeding the annual income and revenue of the city for that year without the assent of two-thirds of the voters and without provision being made for the collection of an annual tax for the interest on such indebtedness as it falls due and to constitute a sinking fund for the payment of the principal as provided in section 3 of article 8 of the Constitution of the State of Idaho. That under the laws of the state the Public Utilities Commission has power to regulate and supervise rates and service of the plaintiff in supplying power and light, and of any municipally owned utility, the mayor and council have exclusive power of regulation of rates and supervision of the service.

It is further alleged that prior to and during the campaign of the election at which the citizens voted on the proposition of issuing the bonds, an engineer employed by the city made an erroneous report as to the feasibility and cost of building a municipal light and power system by the city, and the cost of electric current to the consumers, which was by him at meetings held, and by

publication given publicity, and that the voters were not advised of the omission of two sections of the city from distribution and service as disclosed in the report. Untrue statements are alleged as having been made and published by the chairman of the fire, light, and water committee of the city to the voters as to the cost of each system, not costing more than $300,000, and the kind of service to be rendered. The allegation appears that the properties and business of the plaintiff will suffer irreparable injury, disruption, and damage if it should lose the electric utility business of the city through the illegal acts of the defendants, and it asserts that the reason thereof is that if the municipal light system is erected it will be compelled either to enter into competition and suffer substantial losses in its operations, or abandon entirely its property and system in the city, which would result in discharging of a large number of employees. Its business consists in serving various users in large and small towns, rural districts, farms, mines, mills, and smelters, and pumping water for irrigation, and each class lends aid to plaintiff's ability to carry on the others and are incapable of withdrawal without impairment of plaintiff's ability to serve the others. That the plan, if consummated, with the aid of a grant and loan from the federal government will result in unemployment of its employees. The application to the Administrator is attached to the bill and it is alleged that there was attached thereto the engineer's report as to the type, expense of generation of electricity, and cost of the system which is erroneous in many respects; that it is the intention of the defendants first to construct a plant calculated primarily to serve the business sections and the more populous sections of the city, and that it will be unable to extend the service throughout the entire city with the funds which it has proposed to borrow and receive as a grant from the federal government, which will leave the plaintiff the sparsely populated sections of the city wherein the business is unprofitable and where plaintiff, if it continues to do business in the city, would be unable to serve at reasonable rates without loss; that in the city's application for the loan and grant for the two systems, one hundred and sixty men would be employed in the construction of the plants for a period of six months, and in the engineer's report attached to the application, the labor costs of operation will include five men and one clerk, and in the operation of the water system three men and clerical help and office supplies aggregating $2,000; that the plaintiff, at the present time, has employed in the electric light and water service in the city twenty-four employees.

In the release of the Federal Administrator of date September 27, 1934, and other facts stated, it is declared that the purpose which he has adopted with respect to applications of municipalities for loans and grants is to make electricity more available and at cheaper rates than those of the existing utility.

With this recital of the facts as averred in the bill, we approach the consideration of the questions involved when applied to them. The plaintiff asserts that it has acquired, under the ordinance of the city, a valid franchise which is a property right, and within the protection of the Constitution of the United States, against illegal competition and destruction, and that such right is protected under the principles now recognized by the federal courts in the cases of Walla Walla City v. Walla Walla Water Company, 172 U. S. 1, 19 S. Ct. 77, 43 L. Ed. 341; Boise Artesian Hot & Cold Water Co. v. Boise City, 230 U. S. 84, 33 S. Ct. 997, 57 L. Ed. 1400; Frost v. Corporation Commission of Oklahoma et al., 278 U. S. 515, 49 S. Ct. 235, 73 L. Ed. 483; City of Campbell, Mo. v. Arkansas-Missouri Power Company (C. C. A.) 55 F.(2d) 560; Iowa Southern Utilities Company v. Cassill et al. (C. C. A. 8th) 69 F.(2d) 703; Missouri Public Service Company v. City of Concordia, Mo. et al. (D. C.) 8 F. Supp. 1. And as a property owner and taxpayer in the city it has a right to restrain the city from taking the illegal steps averred in the bill. If the acts of the city as averred in the bill are unconstitutional and invalid, there seems to be no doubt but what the plaintiff has a right to restrain the consummation of them if it will suffer a direct injury by reason thereof, but the validity of an act of Congress will not be considered by the court on the ground that it is merely unconstitutional unless the plaintiff who invokes the power is able to show that it is not only invalid but that it has or is immediately in danger of sustaining some direct injury as a result of its enforcement. In reply to plaintiff's contention, the stress of the argument as urged by defendants is that under the plan for acquiring the electric system, Congress had power to enact the National Industrial Recovery Act from which authority is given to the Federal Administrator to make the loan and grant for the construction of the system under the commerce and general welfare clauses of the Con-

stitution and the existence of an emergency. It is apparent that the National Industrial Recovery Act is predicated upon the thought expressed in it (section 1 [15 USCA § 701]): "A national emergency productive of widespread unemployment and disorganization of industry, which burdens interstate and foreign commerce, affects the public welfare, and undermines the standards of living of the American people, is hereby declared to exist. It is hereby declared to be the policy of Congress to remove obstructions to the free flow of interstate and foreign commerce which tend to diminish the amount thereof." Section 201 (40 USCA § 401) provides: "To effectuate the purposes of this chapter, the President is hereby authorized to create a Federal Emergency Administration of Public Works, all the powers of which shall be exercised by a Federal Emergency Administrator of Public Works." In section 202 of the act (40 USCA § 402) it is also provided: "The Administrator, under the direction of the President, shall prepare a comprehensive program of public works, which shall include among other things the following: (a) Construction, repair, and improvement of * * * public buildings, and any publicly owned instrumentalities and facilities." Then section 203 of the act (40 USCA § 403) provides: "With a view to increasing employment quickly (while reasonably securing any loans made by the United States) the President is authorized and empowered, through the Administrator or through such other agencies as he may designate or create, (1) to construct, finance, or aid in the construction or financing of any public-works project included in the program prepared pursuant to section 402; (2) upon such terms as the President shall prescribe, to make grants to States, municipalities, or other public bodies for the construction, repair, or improvement of any such project, but no such grant shall be in excess of 30 per centum of the cost of the labor and materials employed upon such project."

These provisions of the act and the facts alleged require the consideration:

First. Whether plaintiff will or is in immediate danger of suffering direct injury by reason of the consummation of the plan by the city with the government. The bill states that as a franchise holder and taxpayer in the city, the plaintiff has an investment in its system of more than $5,000,000 in Idaho, and more than $200,000 in the city, and pays government, state, county, and city taxes in large amounts; that the plan covering the acquiring and construction of the system calls for an expenditure of $337,580, which has been approved by the Administrator and the contract already executed by the city for a loan and grant, and which exceeds the amount authorized by the ordinance and voters of the city; that such amount would be insufficient to complete the plant and will leave an incomplete and inadequate plant requiring the levying by the city of a large amount in taxes to complete it; that the plan is unsound from an economic standpoint and will not eliminate unfair competitive practices, but will tend to promote unfair and illegal competition, which will result in a destruction of its property rights and deprive it of the right to continue furnishing electric light and power to the adjacent cities and territories of Northern Idaho, which are connected with its system in the city of Coeur d'Alene. From these and other facts appearing in the bill, it would seem that the plaintiff has sufficient amount of interest and will suffer injury by reason of the adoption of the plan and construction of the system, and would as a taxpayer be subjected to the payment of an illegal tax if the loan and grant are unauthorized, to entitle it to question the legality of the plan.

Second. Does the commerce clause of the National Constitution (article 1, § 8, cl. 3), conferring upon Congress the power to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes," grant to it the power to make the loan and grant involved in this controversy?

One of the influential causes which led to the adoption of the Constitution was the need of an equitable regulation of commerce and the vesting in Congress power to regulate interstate commerce so that uniformity of regulation would be insured against discriminating and conflicting state legislation, and the most confusing topic since its adoption in American constitutional law is: What is the proper dividing line between the respective powers of Congress and those of the states to regulate commerce? The test as to which has the power as to a particular matter is not the kind of business one is engaged in, but whether the business is carried on between the states or affects them. Whether it is of an interstate or intrastate character is to be determined by what is actually done. The decisions of the courts have not been uniform upon the subject, but the fundamental principles are fairly settled, and the difference of opinion manifested in the decisions has been on the application of fundamental principles to the particular facts.

The Supreme Court has often said that an arbitrary rule defining the line separating the exclusive power of the nation from the power of the state cannot be established in view of the particular circumstances and rights involved, but there is uniformity of thought in the decisions that congressional power over commerce is as to the subjects of commerce which are national in their character and require a uniform plan of regulation affecting alike all of the states. It does not extend to regulate purely internal commerce of a state as the state has that reserved right. State of Kansas v. State of Colorado et al., 206 U. S. 46, 27 S. Ct. 655, 664, 51 L. Ed. 956. Whether the particular transaction or act is one of interstate commerce, substance and not form must control.

■ These principles of limitation of the power of Congress as to the nature and extent of transactions under the commerce clause may be summarized to be: That activities which affect interstate commerce are within the power of the central government, and Congress having the right in the field of interstate commerce has only power to legislate in matters affecting and obstructing the free flow of such commerce. The particular facts alleged in the bill, and which we are confined to when applying the principles thus stated, are: That the city on November 2, 1933, called an election for the purpose of submitting to the voters the propositions of issuance of municipal bonds for $300,000 to be used in acquiring, by purchase or by construction, an electric system, and $300,000 to acquire a water system, which were approved by a two-thirds vote. It then applied to the Federal Administrator of Public Works for funds of $650,000 to construct the two systems, a net loan of $475,000 which excludes 30 per cent. grant to be used in the construction of the systems. The total cost of the electric system is estimated to be $337,-580. The type of the electric system is a Diesel plant and is to be located and operated within the city and state and to furnish electric current only to inhabitants of the city who will be the only ones to use and be benefited by it. In no way will it be extended across the state line and can only be treated as a local system which will be intrastate, and not interstate and not affecting directly or indirectly interstate commerce. So the application of the National Industrial Recovery Act to the transaction and plan involved in the present case cannot be construed as affecting interstate commerce or justified upon the ground that power is given to the national government under that clause. Tenth Amendment of United States Constitution; Hammer v. Dagenhart et al., 247 U. S. 251, 38 S. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724; Oliver Iron Min. Co. v. Lord et al., 262 U. S. 172, 43 S. Ct. 526, 67 L. Ed. 929; Child Labor Tax Case, 259 U. S. 20, 42 S. Ct. 449, 66 L. Ed. 817, 21 A. L. R. 1432; Kansas v. Colorado, supra; Missouri Public Service Co. v. City of Concordia et al., supra. We must look beyond the commerce clause for congressional authority, and it is said to be found in the general welfare clause of the Constitution.

■ Third. We come, then, next to consider whether Congress under section 8, cl. 1, of article 1, of the Constitution, "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States," has power to make the loan and grant authorized by the National Industrial Recovery Act when applied to the facts we are considering. The reasons urged by the defendants as to why Congress has such power seem to relate to the extent of the power of Congress and not to the limitations imposed by the Constitution on its actions. The uniform interpretation of this clause from the adoption of the Constitution by the courts and interpreters of it is that the government of the United States can claim no power which is not granted to it by the Constitution as it is one of enumerated and delegated powers, its authority being defined and limited by the Constitution. Those powers enumerated were all with the view to "common defense and general welfare" and are parts of the sentence which embraced the whole of the eighth section of the first article. Their objects cannot be stretched beyond the objects indicated in the enumerated powers granted by the section. The Supreme Court and interpreters of the Constitution have given it the construction that if the welfare be not general but special, it is not within the scope of the Constitution, and the limitation of the words "general welfare" and its object and operation are to be general and not local. It does not grant power to Congress to appropriate moneys of the national government for local or state benefit, as such appropriation is restricted to purposes of common defense and of national benefit, affecting the nation as a whole. This view and spirit of construction was recognized by the Supreme Court when speaking

through Mr. Chief Justice Marshall in considering the general welfare clause in the case Gibbons v. Ogden, 9. Wheat. 1, 195, 6 L. 23, where he said: "The genius and character of the whole government seem to be, that its action is to be applied to all the external concerns of the nation, and to those internal concerns which affect the states generally; but not to those which are completely within a particular state, which do not affect other states, and with which it is not necessary to interfere, for the purpose of executing some of the general powers of the government. The completely internal commerce of a state, then, may be considered as reserved for the state itself."

Again the Supreme Court confirmed the soundness of the construction given by Chief Justice Marshall in the case of State of Kansas v. Colorado, supra, where it is said: "But the proposition that there are legislative powers affecting the nation as a whole which belong to, although not expressed in the grant of powers, is in direct conflict with the doctrine that this is a government of enumerated powers. That this is such a government clearly appears from the Constitution, independently of the Amendments, for otherwise there would be an instrument granting certain specified things made operative to grant other and distinct things. This natural construction of the original body of the Constitution is made absolutely certain by the Tenth Amendment. This Amendment, which was seemingly adopted with prescience of just such contention as the present, disclosed the widespread fear that the national government might, under the pressure of a supposed general welfare, attempt to exercise powers which had not been granted. With equal determination the framers intended that no such assumption should ever find justification in the organic act, and that if, in the future, further powers seemed necessary, they should be granted by the people in the manner they had provided for amending that act. It reads: 'The powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people.' The argument of counsel ignores the principal factor in this article, to wit, 'the people.' Its principal purpose was not the distribution of power between the United States and the states, but a reservation to the people of all powers not granted. The preamble of the Constitution declares who framed it,—'we, the people of the United States,' not the people of one state, but the people of all the states; and article 10 reserves to the people of all the states the powers not delegated to the United States. The powers affecting the internal affairs of the states not granted to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, and all powers of a national character which are not delegated to the national government by the Constitution are reserved to the people of the United States. The people who adopted the Constitution knew that in the nature of things they could not foresee all the questions which might arise in the future, all the circumstances which might call for the exercise of further national powers than those granted to the United States, and, after making provision for an amendment to the Constitution by which any needed additional powers would be granted, they reserved to themselves all powers not so delegated. This article 10 is not to be shorn of its meaning by any narrow or technical construction, but is to be considered fairly and liberally so as to give effect to its scope and meaning. As we said, construing an express limitation on the powers of Congress, in Fairbank v. United States, 181 U. S. 283, 288, 21 S. Ct. 648, 650, 45 L. Ed. 862, 865: 'We are not here confronted with a question of the extent of the powers of Congress, but one of the limitations imposed by the Constitution on its action, and it seems to us clear that the same rule and spirit of construction must also be recognized.' "

The interpretation of the phrase "general welfare" given by Mr. Hamilton limits its operation in the appropriation of money by Congress to matters general and not local, and when Congress pronounces upon the objects which concern the general welfare, the qualification he gives of the generality of the phrase is: "The only qualification of the generality of the phrase in question which seems to be admissible is this; that the object to which an appropriation of money is to be made be general, and not local; its operation extending in fact or by possibility, throughout the Union, and not being confined to a particular spot," Mr. Madison's interpretation seems in effect to be the same when he said: "It has been urged and echoed, that the power 'to lay and collect taxes, duties, imposts, and excises, to pay the debts, and provide for the common defence and general welfare of the United States,' amounts to an unlimited commission to exercise every power which may be alleged to be necessary for the common defence or general welfare. No stronger proof could be given of the distress under which these writers labor for objec-

tions, than their stooping to such a misconstruction."

President Monroe when discussing the general welfare clause in a message to Congress expressed the view that, "The substance of what has been urged on this subject may be expressed in a few words. My idea is that Congress have an unlimited power to raise money, and that in its appropriation they have a discretionary power, restricted only by the duty to appropriate it to purposes of common defense and of general, not local, National, not State, benefit." The discretion in Congress to appropriate money is restricted to purposes of a general nature "not local, National, not State benefit," and an appropriation for purely a local purpose would be an abuse of discretion.

The construction urged by the defendants, that although Congress may not regulate subject-matters on which the Constitution does not authorize legislation, yet it may promote them by appropriation and prescribe how such appropriation shall be applied, as the Constitution leaves it to the discretion of Congress to pronounce upon the objects which concern the general welfare and for which appropriations of money is requisite and proper without any limitation as to the objects being in fact general—such construction would seem to contradict itself, for if Congress is not authorized to legislate upon a certain subject-matter, then it would follow that it may not appropriate money to carry out such unauthorized subject-matter. It certainly would not have power in the first instance to authorize the Administrator to construct the system in the city of Coeur d'Alene, and, if so, then an attempt to appropriate money for the city to do so would be indirectly exercising a power it did not have. To say that Congress has power to declare certain purposes to be national, when as a matter of fact they are not and have no relation to the nation and are strictly local in a state, would defeat and nullify the express provisions of the Constitution limiting the power of Congress. The fact here is an apt illustration of this assumed authority, where the construction of a Diesel engine plant and light system, in and to be used solely by the inhabitants of the city of Coeur d'Alene, would not in any way be for a national purpose, and to assert under the facts in the bill that its construction would relieve unemployment, and that an emergency existed, does violence to the English language. The true principle is well settled in Linder v. United States, 268 U. S. 5, 45 S. Ct. 446, 449, 69 L. Ed. 819, 39 A. L. R. 229, as follows: "Congress cannot, under the pretext of executing delegated power, pass laws for the accomplishment of objects not intrusted to the federal government. And we accept as established doctrine that any provision of an act of Congress ostensibly enacted under power granted by the Constitution, not naturally and reasonably adapted to the effective exercise of such power, but solely to the achievement of something plainly within power reserved to the states, is invalid and cannot be enforced."

The instances in which Congress has levied taxes and made appropriations to promote purposes deemed by it national are those which in fact may be designated as relating to national matters relieving distress and suffering and are mostly acts applying to matters which come under the commerce clause. The citations urged by the defendants relate to such situations, and do not uphold the contention that the courts are not empowered to review an act of Congress where it is urged that it is repugnant to the Constitution when in attempting to act or appropriate money of the United States for purposes not related to the powers delegated to Congress by the Constitution. Child Labor Tax Case, supra; Hammer v. Dagenhart, supra; United States et al. v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co., 282 U. S. 311, 51 S. Ct. 159, 75 L. Ed. 359; Adair v. United States, 208 U. S. 161, 28 S. Ct. 277, 52 L. Ed. 436, 13 Ann. Cas. 764. Applying the Tenth Amendment to the facts here, no power is granted to the national government to invade the exclusive power and function of the state to regulate utilities in the state engaged solely in intrastate business, and the court cannot give effect to such legislation although designed to promote the highest good. Tenth Amendment to the Constitution; Child Labor Tax Case, supra; Hart Coal Corporation et al. v. Sparks et al. (D. C.) 7 F. Supp. 16.

It is not seriously urged that under the facts alleged in the bill, an emergency in fact exists or to relieve unemployment or distress in the city of Coeur d'Alene, calling for the making the loan and grant. The bill discloses just the opposite, and one would gather from it that the real purpose of making the loan and grant is to bring about the construction of a utility and to regulate the rates for electricity, for it clearly indicates that the lowering of rates is the primary purpose and object of the national government in offering aid to the city as the Administrator requires of the city to agree to reduce the rates 20 per cent. below those now charged by the plaintiff

before the loan and grant will be made, and should the plaintiff not reduce its rate to meet the Administrator's approval the loan and grant will be refused. No other reason appears why the loan and grant is being made. Obviously direct control of local utilities operating solely within the state and the regulation of rates is in the state and beyond the power of the national government.

In the recent case of Missouri Public Service Company v. City of Concordia et al., supra, the company, a franchise holder and taxpayer, sought to restrain the city from making financial arrangement with the Administrator of Public Works by way of a loan and grant to construct an electric plant, and the court held that the Administrator had no constitutional authority to aid the city in the construction of the project as its operations were purely local and intrastate.

Reliance is had on the recent decision in the case of Missouri Utilities Co. v. City of California et al. (D. C.) 8 F. Supp. 454, of date November 2, 1934, as support of the construction of the general welfare clause urged by defendants to the effect that the object to be obtained is within the power of Congress, because Congress has declared in the Recovery Act that the Administrator shall prepare a program of public works which shall include the construction of public buildings and publicly owned instrumentalities and facilities, as the object and the selection of the means if related to it is exclusively within the discretion of Congress. The unsoundness in applying such reasoning to the power of Congress to pronounce upon an object which it thinks concerns the general welfare and to appropriate money of the United States to the instance and plan here, the primary and only object to be obtained is the construction of a municipal electric plant to be located and operated exclusively within the city of Coeur d'Alene, is not one of the objects within the delegated powers granted to Congress or incidental or in relation thereto; if such be the case, then any attempt, regardless of the motive, to appropriate money of the United States to carry out such unauthorized object, would be exercising a power indirectly which could not be done directly and therefore is unconstitutional. Such an interpretation, so urged by the defendants, refutes itself and is an attempt to add to the Constitution a power of Congress that does not exist.

Finally, the plaintiff insists that the plan of financing the proposed plant violates section 3 of article 8 of the State Constitution, as the ordinance which was submitted to the voters provided only for incurring a liability or indebtedness in the sum of $300,000; whereas, the plan proposed provides for a plant costing in excess thereof. The provisions of the State Constitution limiting city's indebtedness and liability is: No city shall incur any indebtedness, or liability, in any manner, or for any purpose, exceeding in that year, the income and revenue provided for it for such year, without the assent of two-thirds of the qualified electors thereof voting at an election to be held for that purpose, nor unless, before or at the time of incurring such indebtedness, provision shall be made for the collection of an annual tax sufficient to pay the interest on such indebtedness as it falls due, and also to constitute a sinking fund for the payment of the principal thereof, within twenty years from the time of contracting the same. Any indebtedness or liability incurred contrary to this provision shall be void.

The scope of the words "indebtedness or liability," as employed in the State Constitution, is meant to cover all character of debts and obligations for which the city may become bound. The Supreme Court of the state has left no doubt as to its construction of this provision, for it has said: "The Constitution not only prohibits incurring any indebtedness, but it also prohibits incurring any *liability* 'in any manner or for any purpose,' exceeding the yearly income and revenue. In this connection, it should also be observed that it not merely prohibits incurring any *indebtedness or liability* exceeding the *revenue* of the current year, but it also prohibits incurring any indebtedness or liability exceeding the *income* and *revenue* provided for such year." Feil v. City of Cœur d'Alene, 23 Idaho, 32, 49, 129 P. 643, 649, 43 L. R. A. (N. S.) 1095; Miller v. City of Buhl, 48 Idaho, 668, 284 P. 843, 72 A. L. R. 682.

In Straughan v. City of Coeur d'Alene, 53 Idaho, 494, 24 P. (2d) 321, the court held that a taxpaying resident and citizen could maintain a bill to restrain the city from acquiring light and waterworks system under the statute and ordinance imposing a liability upon the city, without providing for annual tax to discharge the liability, contrary to the Constitution, and gave the same construction of section 3, article 8, of the State Constitution as given in its previous decisions. It is obvious that the cost of the electric plant under the plan involved will exceed $300,000, the amount authorized by the ordinance and voters of the city, and is void

under the State Constitution and decisions of the State Supreme Court.

Application of these principles to the facts appearing in the bill has not occasioned much difficulty, and the conclusion reached accords with the general interpretation of the clauses of the Constitution, when applied to the provisions of the National Industrial Recovery Act and the facts here involved. To now depart from such interpretation would add to the Constitution a power of Congress which does not exist, without pursuing the method provided in amending it.

From every point of view the loan and grant attempted to be made by the city with the government cannot be sustained, as they are illegal and unauthorized, and the conclusion thus reached applies to the consummation of the loan and grant with the government and the incurring of an indebtedness and liability of cost of acquiring, by purchase or by construction, the electric plant in excess of $300,000, but with the exception thus stated relative to the loan and grant by the government, should the city desire to purchase or construct such a plant by the sale or pledging of its bonds in an amount not exceeding $300,000, authorized by its ordinance and voters, it may do so in the manner provided for by the state laws.

An order will be issued restraining the defendants and each of them from carrying out the contemplated loan and grant with the government during the pendency of suit and until further order of the court. The motions to dismiss are denied. Exception granted to the defendants.