### NORTH DAKOTA–MONTANA WHEAT GROWERS' ASS'N v. UNITED STATES.

#### No. 9679.

Circuit Court of Appeals, Eighth Circuit.

July 14, 1933.

Rehearing Denied Aug. 28, 1933.

574

Arthur Le Sueur, of Minneapolis, Minn. (C. J. Murphy, of Grand Forks, N. D., on the brief), for appellant.

O. A. Blanchard, Asst. U. S. Atty., of St. Paul, Minn. (Lewis L. Drill, U. S. Atty., of St. Paul, Minn., on the brief), for the United States.

Before KENYON and GARDNER, Circuit Judges, and DEWEY, District Judge.

KENYON, Circuit Judge.

This is a suit in equity brought by the United States to foreclose a real estate mortgage upon certain property in Hennepin county, Minn., given by appellant to secure the payment of a $25,000 loan made to appellant by the Federal Farm Board (herein termed the Farm Board) from the revolving

fund provided by the Agricultural Marketing Act (7 USCA §§ 521–535). Appellant is a co-operative association, organized under the laws of the state of North Dakota. For convenience the parties will be designated as in the trial court.

There is no dispute as to the loan being made and the money advanced to defendant. A note for the $25,000, and a mortgage to secure the same, was given to plaintiff on certain lots of defendant in Hennepin county, Minn. The note was payable on demand. It is not necessary to go into the matters concerning default in interest and tax payments, as it is conceded that the amount of the note and interest is due. In the amended answer defendant denies that plaintiff has authority to take, hold, or own notes under the Constitution of the United States and the laws thereof, and asserts that the Farm Board is the real owner of the note and a necessary party to the action; that the $25,000 loan was furnished by the Farm Board from a revolving fund provided by an Act of Congress known as the Agricultural Marketing Act which confers no power upon the government to maintain this action; that the Farm Board had in its possession sufficient money and property of defendant to pay the insurance premiums claimed to be in default, likewise the principal and interest of the mortgage; and that, applying the same, no default existed. Further, the amended answer states that 3,985,646.33 bushels of wheat were delivered on the order of the Farm Board to the Stabilization Corporation, or to the Farmers' National Grain Corporation, agencies of the Farm Board (hereinafter called the stabilization corporations), for which no consideration was received, and that certain sums of money were delivered to the Farm Board by defendant; that the amount owing by the Farm Board to defendant in the month of June, 1931, was more than $500,000 in excess of the sum necessary to pay the note and mortgage; that said delivery of wheat was in fact a sale to the Farm Board, and that at the time of foreclosure, if proper credit had been given, there was no indebtedness to the plaintiff from the defendant; that the Farm Board, the stabilization corporations, and defendant had an extensive course of dealings, and that, in order to determine the amount due from the Farm Board or from the stabilization corporations to defendant, an accounting would be necessary; that the claim could not be presented to the accounting officers of the Treasury because no accounting had been had.

Motions were made by plaintiff to strike the amended answer of the defendant on a number of grounds, viz. that the allegations were argumentative and stated legal conclusions; that they were sham and frivolous and failed to state any defenses to plaintiff's cause of action, in violation of equity rules 21 and 30 (28 USCA § 723); that the allegations claiming a set-off show on their face that the court was without jurisdiction to determine the same because in substance and effect they constituted an independent action against the United States and the United States had not consented to be sued nor waived its immunity from suit.

The court sustained the motion and entered a decree of foreclosure pro confesso.

Defendant's theory is that the Farm Board furnished money to defendant to advance to its membership on the purchase price of wheat; that the members of defendant turned over the wheat to the stabilization corporations organized under state laws and which were agencies of the Farm Board; that the wheat was being maintained at a pegged price by said Board of $1.25 per bushel which was in advance of the market price, the entire arrangement being to hold up the price of wheat; that delivery of the documents of title to the Farm Board constituted a sale; and that the Farm Board could have applied the proceeds of the sale on indebtedness of defendant to the plaintiff. The purpose of the defense is not to defeat the government claim or to secure judgment against the government, but is to effect an offset arising out of the transactions concerning the alleged sale of the wheat.

Stabilization corporations were created to carry out the purposes of the Agricultural Marketing Act. The voting stock and membership interests were to be owned only by co-operative associations handling the commodity. The stock is held by the members—not by the United States. Defendant was presumably a member of the corporations to which the wheat was delivered.

The difficulties in defendant's pathway in this particular proceeding to accomplish its purpose seem insurmountable. The chief ones are the questions of jurisdiction in the trial court to entertain the claimed offset of some $26,000 against the claim of the government, and the fact that defendant's claims were not presented to accounting officers of the government as provided by section 774, chapter 18, title 28 USCA before asserting them as an offset.

Defendant insists that the Farm Board should have brought the action, that the gov-

ernment has no authority to bring it, and that the Attorney General has no authority in the premises.

Is there any merit in these contentions?

◼ The Farm Board was created by the Agricultural Marketing Act, sections 521–535 inclusive, chapter 22, title 7. The general powers given to it under sections 524 and 525 do not provide that it may sue or be sued. It had the right to recognize stabilization corporations if such corporations were duly organized under the laws of a state or territory. It evidently had recognized the stabilization corporations which dealt with defendant in relation to the wheat. These corporations acted as marketing agencies for their stockholders or members and for the purpose of controlling any surplus in a commodity in furtherance of the general policy of the Agricultural Marketing Act. They were distinct entities, duly incorporated, and undoubtedly entitle to sue and to be sued as other corporations. It is entirely different, we think, as to the Farm Board. It has no identity separate and distinct from the government—it is merely an unincorporated agency of the government to carry out the purposes of the Agricultural Marketing Act. The government has created at various times corporations for certain purposes and to act as instrumentalities in furtherance of governmental purposes, and provided as to some of them that they may sue and be sued. Such provisions exist as to Federal Reserve Banks, section 341, chapter 3, title 12 USCA; Federal Land Banks, section 676, chapter 7, title 12 USCA; Federal Intermediate Credit Banks, section 1023, chapter 8, title 12 USCA; Reconstruction Finance Corporation, section 604, chapter 14, title 15 USCA. Where the government has intended that one of its agencies shall be subject to suit it has provided therefor in the creative act. It is significant that no such power was bestowed on the Farm Board. Analogy can be drawn between the situation here and that as to the United States Shipping Board and the Shipping Board Emergency Fleet Corporation. The Emergency Fleet Corporation was formed by the Shipping Board under power conferred by Congress. It was an instrumentality of the government, organized as a private corporation, with the stock owned by the government. The courts have quite generally held that, although it was an instrumentality of the government, it could sue and be sued the same as any other private corporation.

In United States ex rel. Skinner & Eddy Corporation v. McCarl, Comptroller General, 275 U. S. 1, at page 11, 48 S. Ct. 12, 16, 72 L. Ed. 131, the court said, "For the Fleet Corporation is an entity distinct from the United States and from any of its departments or boards." The fact that all its stock is owned by the United States does not destroy its separate entity. United States v. Strang, 254 U. S. 491, 41 S. Ct. 165, 65 L. Ed. 368.

In Cohn et al. v. United States Shipping Board et al. (C. C. A. 6) 20 F.(2d) 56, distinction is drawn between the Shipping Board and the Emergency Fleet Corporation, and it is held that the Shipping Board is not subject to suit, but that the Fleet Corporation is and is liable for torts and breaches of contract the same as other private corporations, citing many cases on the subject. See, also, Sloan Shipyards Corp'n v. U. S. Shipping Board E. Fleet Corp., 258 U. S. 549, 42 S. Ct. 386, 66 L. Ed. 762; Fidelity Trust Co. of New York et al. v. U. S. Shipping Board Emergency Fleet Corp. (D. C., S. D. New York) 15 F.(2d) 600; Russell Wheel & Foundry Co. v. United States (C. C. A. 6) 31 F.(2d) 826, 828.

We find no cases holding that the Shipping Board can be sued as a distinct entity.

The question in these various cases in which the Fleet Corporation is concerned is not the immunity of the sovereign but whether the corporation partakes of that immunity.

◼ The situation as to the Farm Board is we think analogous to that of the United States Shipping Board. Both are mere agencies of the United States with no such distinct entity as is possessed by the stabilization corporations and the Fleet Corporation. We are satisfied the Farm Board could not have brought suit to recover the moneys loaned to defendant.

◼ However, if the Farm Board were an independent entity capable of suing and being sued, and even if the note and mortgage ran to it, the United States would not be precluded from maintaining the suit here. It would remain the real party in interest suing on a contract made by its authorized agent. In United States v. Czarnikow-Rionda Co. (C. C. A. 2) 40 F.(2d) 214, 215, it was held that the United States may sue and recover on contracts entered into by the Fleet Corporation as its duly authorized agent or officer. In Russell Wheel & Foundry Co. v. United States, supra, it was held that the United States Shipping Board Emergency Fleet Corporation, though a corporation of the District of Columbia, was nevertheless an instrumentality of the United States, and that an overpayment by it of government funds was re-

coverable by the United States directly, as the "real party in interest." At pages 827, 828 of 31 F.(2d), the court pointed out that "the outstanding and all sufficient feature is that the money sued for is part of a vast public fund belonging to plaintiff and appropriated by law out of the Treasury to plaintiff's shipbuilding program, and authorized by law to be expended by the Fleet Corporation as the delegated agency of the President." See, also, United States v. Skinner & Eddy Corp. (D. C. Wash. N. D.) 28 F.(2d) 373; United States v. Skinner & Eddy Corp. (C. C. A. 9) 35 F.(2d) 889; Erickson v. United States, 264 U. S. 246, 44 S. Ct. 310, 68 L. Ed. 661.

■ The moneys advanced by the Farm Board under the Act of Congress providing a revolving fund of $500,000,000 were government funds to be devoted to the advancement of a public purpose. By this suit the right to have the money of the government loaned for a public purpose returned to it is being asserted. The argument is not at all appealing that the government had no authority to bring this action merely because the Agricultural Marketing Act did not so provide, and that it must be brought by the Farm Board. We have pointed out that the Farm Board had no such authority. The government being the proper party to bring the suit, it follows that the Attorney General, the head of the Department of Justice with broad powers and responsibilities in respect to all legal matters of the government (sections 291–339, chapter 5, title 5 USCA) had authority to initiate this action (United States v. San Jacinto Tin Co., 125 U. S. 273, 8 S. Ct. 850, 31 L. Ed. 747).

■■ Defendant is in the position here of seeking by suit either to establish a claim against the United States directly, or to assert as an offset to the suit of the United States a claim against the stabilization corporations. Of course the latter it cannot do, and the former can be done only if the United States has consented to be sued. Assuming, but not so deciding, that the delivery of grain to these stabilization corporations constituted a sale to the United States, nevertheless the question would arise as to the United States consenting to be sued for the price thereof. The accounting demanded by way of counterclaim is in excess of $600,000. Defendant does not ask judgment against the United States—expressly disavows it—but seeks to cancel a conceded liability to it of some $26,000 by virtue of its counterclaim.

■ It is fundamental that the United States cannot be sued without its permission, and that permission must be specifically granted by Congress. It will not be implied. It is a deep-rooted principle in the fabric of all English speaking countries that a sovereign is immune from suits in its own courts. In Nassau Smelting & Refining Works, Ltd. v. United States, 266 U. S. 101, 106, 45 S. Ct. 25, 69 L. Ed. 190, the court said: "The objection to a suit against the United States is fundamental, whether it be in the form of an original action, or a set-off, or a counterclaim. Jurisdiction in either case does not exist, unless there is specific congressional authority for it. Nor is there doubt that the question is one which involves the jurisdiction of the District Court as a federal court under the statutes of the United States, for the jurisdiction of the District Court in this regard is wholly dependent on such statutes." See, also, United States v. Porto Rico Fruit Union (C. C. A. 1) 12 F.(2d) 961; Schroeder v. Davis (C. C. A. 8) 32 F.(2d) 454; Oak Worsted Mills v. United States (Ct. Cl.) 36 F.(2d) 529; Banco-Mexicano, etc., v. Deutsche Bank, 263 U. S. 591, 44 S. Ct. 209, 68 L. Ed. 465; Davis v. Corona Coal Co., 265 U. S. 219, 44 S. Ct. 552, 68 L. Ed. 987.

■ The set-off presented here as a counterclaim is a suit against the United States, and, the United States not being subject to suit without permission, a pertinent inquiry arises as to just how, when, and where the United States has granted permission that such a suit may be brought against it in the United States District Court.

Section 41, subdivision (20), chapter 2, title 28 USCA provides: "Concurrent with the Court of Claims, of all claims not exceeding $10,000 founded upon the Constitution of the United States or any law of Congress, or upon any regulation of an executive department, or upon any contract, express or implied, with the Government of the United States, or for damages, liquidated or unliquidated, in cases not sounding in tort, in respect to which claims the party would be entitled to redress against the United States, either in a court of law, equity, or admiralty, if the United States were suable, and of all set-offs, counterclaims, claims for damages, whether liquidated or unliquidated, or other demands whatsoever on the part of the Government of the United States against any claimant against the Government in said court."

This is not sufficient permission for this action, as the counterclaim sought here to be set off against the government amounts to some $26,000. The extent to which the Unit-

578

ed States has consented to be sued in its District Courts by way of counterclaim or otherwise is fixed by the foregoing statute at $10,000. We know of no other statute which would warrant the exercise of jurisdiction by the District Court as to this counterclaim or set-off.

■ Another serious barrier to the defendant's case is section 774, chapter 18, title 28 USCA, which provides that in suits brought by the United States such as this no claims for credits shall be admitted upon trial except such as have been presented to the accounting officers of the government. No such presentation of the claims here asserted has been made, and no excuse regarded as such by the statute is asserted. There is no doubt that defendant could have procured full information concerning the accounts of the stabilization corporations with which it dealt by application thereto or to the Farm Board. Defendant has not complied with the requirements of this section.

Defendant stresses the argument that it is not the government of the United States as a government which brings this action but that the government is acting as a private citizen, that it has descended "from its throne, * * * to dwell in the Marts of Trade," leaving behind its mantle of sovereignty, waiving its prerogatives, and engaging in a strictly private business, and therefore is to be considered the same as any other entity engaged in business.

■ It is true that courts have drawn distinctions between the action of the government in what is termed its "sovereign" capacity and its operations in commercial transactions generally carried on by corporations organized by the government and invested with some of the sovereign functions. In the application of the principle that the sovereign is immune from suit in its own courts, no distinction has been drawn between strictly "governmental functions" and those which partake in part of the nature of ordinary private business. When the sovereign itself is sued, the immunity is absolute, regardless of the functions out of which the suit arose, and the suit can only be maintained by the sovereign's consent. This court held in Schroeder v. Davis, supra, that an action against the Railroad Administrator was an action against the government, and could be maintained only by reason of federal laws.

■ Even under defendant's theory it could not be successfully claimed that the government in loaning money to assist the agricul-

tural development of the country and subsequently trying to collect it for the benefit of the national treasury had entered into private business or become a trading partner.

It is a matter of common knowledge that when the Agricultural Marketing Act was passed agriculture was in a depressed condition. The government was seeking a way to increase prices of farm products in order to stimulate production and thus protect the food supply of the nation. If the taking over and operating of the railroad systems of the country was an act in the sovereign capacity of the government, E. I. Du Pont de Nemours & Company v. Davis, Director General of Railroads, 264 U. S. 456, 44 S. Ct. 364, 68 L. Ed. 788; Mellon, Director General v. Michigan Trust Co., 271 U. S. 236, 46 S. Ct. 511, 70 L. Ed. 924, and if the operation of ships by the Fleet Corporation was performing a function of government, Emergency Fleet Corporation v. Western Union Telegraph Co., 275 U. S. 415, 48 S. Ct. 198, 72 L. Ed. 345; The Messenger (D. C., S. D. Tex.) 14 F.(2d) 147; United States v. Porto Rico Fruit Union, supra; United States v. Skinner & Eddy Corp., supra, it would seem that the protection of the food supply of the nation and the stimulation of agriculture were fully as much a sovereign function of government. The first section of the Agricultural Marketing Act, section 521, chapter 22, title 7 USCA, discloses the policy of the act, which is to place the industry of agriculture on the basis of economic equality with other industries, and to protect, control, and stabilize the currents of interstate and foreign commerce in the marketing of agricultural commodities and other food products—clearly an exercise of national sovereignty.

■ Defendant asserts: "If the Agricultural Marketing Act be correctly construed by the lower court in its holding that no cross bill or counter-claim can be allowed in excess of ten thousand dollars and that, therefore, the bill must be taken as confessed, then the law which authorizes that is unconstitutional under the provisions of article 14 of the [Amendments to the] Constitution of the United States, for such construction permits the taking of the defendant's property without permitting a day in court or any answer. The court was, therefore, in error in taking the bill as confessed." This amounts to a contention that it would be unconstitutional to allow the United States to sue without requiring its consent to waive its immunity from suit. This is a doctrine that can find support nowhere. Further, defendant is not

in position to raise this question. It has accepted loans under the act, it has given its note and mortgage to the plaintiff, it does not deny receiving the money nor that these loans were to be collected, and, having proceeded under the act, it is not in position now to question its constitutionality. Hurley v. Commission of Fisheries, 257 U. S. 223, 42 S. Ct. 83, 66 L. Ed. 206; United Fuel Gas Co. v. R. R. Commission of Kentucky, 278 U. S. 300, 49 S. Ct. 150, 73 L. Ed. 390; Frost, etc., v. Corporation Commission, 278 U. S. 515, 49 S. Ct. 235, 73 L. Ed. 483.

We have not discussed the relation of Equity Rule 30 (28 USCA § 723) to certain allegations of the answer as we do not deem an interpretation of that rule essential to a decision of this case. We are satisfied there was no jurisdiction in the District Court to consider the counterclaim. Neither the original nor the amended answer presented a defense to the suit.

The question is not here as to the liability of the stabilization corporations for any legitimate claim of defendant arising out of the transactions in wheat. They have presumably been found by the Farm Board to have been duly organized under state laws. Section 529, chapter 22, title 7 USCA.

Defendant's recourse would seem to be against them.

There are very appealing equities in defendant's position, but we cannot set aside well-established and fundamental legal principles to assist in righting this situation. The trial court was justified in entering a decree for plaintiff.

Its decree and judgment is affirmed.