**BERDIE et al. v. KURTZ et al. ***
No. 7657.

Circuit Court of Appeals, Ninth Circuit.
March 4, 1935.

*Rehearing denied April 22, 1935.

GARRECHT, Circuit Judge, dissenting.

Harold M. Stephens, Asst. Atty. Gen., and Peirson M. Hall, U. S. Atty., and Clyde Thomas, Asst. U. S. Atty., both of Los Angeles, Cal., Carl McFarland, Mac Asbill, and A. H. Feller, Sp. Assts. to Atty. Gen., and Jerome N. Frank, General Counsel, Agricultural Adjustment Administration, Arthur C. Bachrach, Sp. Advisor to General Counsel, A. A. A., John J. Abt, Chief of Litigation Section, A. A. A., Donald B. MacGuineas, and M. Camper O'Neal, Attys., A. A. A., all of Washington, D. C., for appellants.

Lewis D. Collings, Edward M. Selby, H. C. Johnston and Walter F. Haas, all of Los Angeles, Cal., William T. Selby, of Ventura, Cal., and Amos Friedman, of Los Angeles, Cal., for appellees.

Before WILBUR and GARRECHT, Circuit Judges, and CAVANAH, District Judge.

WILBUR, Circuit Judge.

For a statement of facts we quote from the appellants' brief as follows:

"This is an appeal from interlocutory orders entered on September 20, October 1, and October 3, 1934, by the District Court for the Southern District of California. The order entered September 20, 1934, temporarily enjoined appellants (defendants below) from enforcing or attempting to enforce as against the appellees, the Agricultural Adjustment Act (title 7, U. S. C., c. 26 [7 USCA § 601 et seq.]) and two milk licenses issued by the Secretary of Agriculture, pursuant to section 8 (3) of that Act [7 USCA § 608 (3)], and from making any of the demands and committing any of the acts with relation to the appellees complained of in the original and supplemental bill of complaint. The orders of October 1 and October 3, 1934, denied appellants' motions to dismiss appellees' original and supplemental bill of complaint and to vacate the temporary injunction entered September 20 as aforesaid.

" 'Sections of the Act Here Involved.

" 'The provisions of the Agricultural Adjustment Act here involved are as follows:

" 'Declaration of Emergency.

" 'That the present acute economic emergency being in part the consequence of a severe and increasing disparity between the prices of agricultural and other commodities, which disparity has largely destroyed the purchasing power of farmers for industrial products, has broken down the orderly exchange of commodities, and has seriously impaired the agricultural assets supporting the national credit struc-

ture, it is hereby declared that these conditions in the basic industry of agriculture have affected transactions in agricultural commodities with a national public interest, have burdened and obstructed the normal currents of commerce in such commodities, and render. imperative the immediate enactment of title I of this Act.' [7 USCA § 601.] * * *

"Three different methods for carrying out the declared policy are provided in section 8 of the Act, which reads in part as follows:

" 'Sec. 8. In order to effectuate the declared policy, the Secretary of Agriculture shall have power—* * *

" '(3) To issue licenses permitting processors, associations of producers, and others to engage in the handling, in the current of interstate or foreign commerce, of any agricultural commodity or product thereof, or any competing commodity or product thereof. Such licenses shall be subject to such terms and conditions, not in conflict with existing Acts of Congress or regulations pursuant thereto, as may be necessary to eliminate unfair practices or charges that prevent or tend to prevent the effectuation of the declared policy and the restoration of normal economic conditions in the marketing of such commodities or products and the financing thereof. The Secretary of agriculture may suspend or revoke any such license, after due notice and opportunity for hearing, for violations of the terms or conditions thereof. Any order of the Secretary suspending or revoking any such license shall be final if in accordance with law. Any such person engaged in such handling without a license as required by the Secretary under this section shall be subject to a fine of not more than $1,000 for each day during which the violation continues.' [7 USCA § 608 (3).]

"The only provision of the Act involved in this case is section 8 (3).

"The Los Angeles Milk Licenses.

"Pursuant to section 8 (3) of the Act, a license for milk, Los Angeles Milk Shed, license No. 17, was issued by the Secretary of Agriculture on November 16, 1933. This license was terminated by the Secretary pursuant to its terms on May 31, 1934, and at the same time the Secretary issued a License for Milk, Los Angeles, California, Sales Area, License No. 57, which has been in effect continuously since that date.

"Both licenses are blanket licenses and license all distributors engaged in distributing milk for consumption in the Los Angeles Sales Area to engage in business upon the terms and conditions therein provided. The licenses require every distributor in the Los Angeles Sales Area to pay producers for their milk the minimum prices fixed in the license, and also fix a schedule of minimum resale prices below which distributors are forbidden to sell milk or cream at retail. All other provisions of the licenses are merely a part of a plan to insure that producers shall receive fair prices for their milk. The appellees were formerly engaged in the distribution of milk and cream for consumption in the Los Angeles Sales Area and as such were licensed under both licenses. The second license, issued on May 31, 1934, provides, among other things, that the failure of a distributor to fulfill all of his obligations under the original license shall constitute a violation of the second license.

"Appellant Berdie since February 26, 1934, has not been in the employ or connected with the Agricultural Adjustment Administration, United States Department of Agriculture. The appellant Milk Producers, Inc. is a corporation whose functions and duties under License No. 17 were to receive all milk in excess of the daily requirements for fluid consumption in Los Angeles, and to manufacture and dispose of this surplus milk in the form of manufactured dairy products. Its function in this capacity ceased with the termination of License No. 17. Appellants Cronshey, Corbett, Howells, Cameron, Lucas, Maharg, Marcus, Adamson, Day, Stabler, Buechert, Hibbert, Kuhrt, Platt, McOmie, Brice, Erwin, Read, Perkins. and Weaver are members of the Los Angeles Milk Industry Board organized pursuant to License No. 17 and likewise have no official connection with License No. 57 now in force. Appellant Larsen is in charge of the Los Angeles office of the Field Investigation Section, Agricultural Adjustment Administration, United States Department of Agriculture, and as such investigates violations of the Agricultural Adjustment Act and reports the same to the Department of Agriculture at Washington, D. C. Appellant Darger is the Market Administrator appointed by the Secretary to supervise the operation of License No. 57. Appellant Hall is the United States Attorney for the Southern District of California.

"Appellants' Present Status With Respect to the Licenses.

"By virtue of the authority vested in him by section 8 (3) of the Act, and after full compliance with the procedure provided for in General Regulations, Agricultural Adjustment Administration, series 3, as amended, the Secretary of Agriculture, on July 28, 1934, found that appellees had violated License No. 17 in several respects and revoked the licenses of each of the appellees under License No. 57.

"On or about the effective date of the Orders of the Secretary of Agriculture revoking appellees' licenses, each of the appellees transferred to other persons or corporations that portion of their respective businesses having to do with the distribution, marketing, and handling of milk as distributors in the Los Angeles Sales Area and have not since such date engaged in the business of distributing milk in this area.

"The original bill was filed on January 11, 1934, and sought to enjoin appellants from taking any steps towards the revocation of appellees' licenses under License No. 17 and from making demands upon appellees to fulfill their obligations under this License. No order based on the original bill was entered by the court, and on July 28, 1934, as stated above, appellees' licenses were revoked by the Secretary of Agriculture. The supplemental bill of complaint, filed September 4, 1934, alleges the revocation of appellees' licenses by the Secretary. It also alleges that the appellants who are members of the Los Angeles Milk Industry Board and appellant Milk Producers, Inc., demanded of appellees that they make certain payments and that the amounts demanded 'were not calculated in accordance with the provisions' of License No. 17 and that appellees did not receive a fair or impartial hearing at the administrative proceedings held for the purpose of determining whether or not their licenses should be revoked."

The appellees' business is conducted in the state of California and in the Los Angeles sales area. This area includes Los Angeles and Orange and parts of San Bernardino and Riverside counties, Cal., as described by the Secretary of Agriculture in license No. 17 "for milk, Los Angeles Milk Shed," issued November 16, 1933. The "Los Angeles Milk Shed" is the producing area likewise defined as those "dairy farms in the counties of Los Angeles, Riverside, San Bernardino and Orange * * * as were producing Grade A market milk on the effective date of this license" (November 20, 1933, 12:01 a. m., eastern standard time) and similar dairy farms outside said counties, "and such other dairy farms as may become entitled to produce milk for Grade A market milk." The "Los Angeles Cream Shed" means those dairy farms in the counties of Imperial, San Luis Obispo, Tulare, Kings, Madera, Ventura, Merced, Kern, Fresno, and Santa Barbara "producing or to produce such Grade A milk excepting those producing for distribution in said counties, and also excepting farms located in Los Angeles Milk Shed." All those areas are within the state of California unless the phrase "dairy farms outside said counties" in the above description of the Los Angeles Milk Shed can be applied to counties outside the state. The so-called license is not in any proper sense a license at all. It is a set of rules adopted by the Secretary of Agriculture for the regulation of the production, sale, and distribution of milk, and the division of the proceeds derived therefrom within the "Los Angeles Milk Shed." These regulations are extremely comprehensive, and have for their avowed purpose the fixing of prices to be realized by the milk producer within the Los Angeles sales area and the Los Angeles Milk Shed and the Los Angeles Cream Shed, with a view of securing profitable and adequate returns to the producers in accordance with the avowed policy of the Agricultural Adjustment Act, § 2, 48 Stat. 31, 32 (7 USCA § 602). In a general way it may be said that the effect of the regulations is to establish a milk pool and a cream pool in which all the producers pool their milk or cream, respectively, for sale and distribution. In order to effectuate this distribution the Secretary of Agriculture has adopted as its standard the price conditions which obtained between August, 1909, to July, 1914, as required by the Agricultural Adjustment Act, § 2, supra, and has provided that each producer shall be paid for his milk on the arbitrary assumption that he has sold the same proportion of his milk for various purposes that he did in the period from March 16, 1933, to June 15, 1933, which is called the "production base period." The price for which the ascertained quantity of milk is to be paid is based upon the average prices actually received in the Los Angeles market. The Los Angeles Milk Industry Board, whose members are defendants herein, is an organization set up by the Secretary of Agriculture in the

license No. 17, and is demanding from the appellees large sums of money (about $52,000) derived from the sale of milk by them, for distribution by the Board to producers other than those from whom the appellees purchased the milk.

Since this action was begun the licenses of the several appellees have been revoked for failure to comply with the terms of license No. 17, supra, although that license has been superseded by license No. 57, in accordance with a reserve of power so to do in the order promulgating the new license (No. 57). The appellants are therefore now liable for the penalty of $1,000 per day imposed by the Agricultural Adjustment Act if they undertake to engage in the milk business.

It is conceded that no part of the milk handled by the appellees is produced outside the state of California, and that it never leaves the state, and that it is not intended by anybody connected with it that any part of it shall leave the state. The milk is produced for the Los Angeles sales area, is supplied to that market, and consumed by it.

The basis for the assertion of authority over the milk industry in the Los Angeles sales area or Milk Shed or Cream Shed is that it is interstate commerce.

The action of the Secretary of Agriculture, interfering with appellees in the exercise of their constitutional right to make contracts in the conduct of an otherwise perfectly legal business, is based upon an act of Congress known as the Agricultural Adjustment Act, supra, and the particular provision of that act under which the Secretary purports to act and by which his acts are sought to be justified in granting and revoking licenses is section 8, subd. 3.

Appellees contend that even if Congress has the power to delegate such authority to the Secretary of Agriculture it has not attempted to do so, but, on the contrary, has expressly prohibited its exercise. This is a question of statutory construction.

The primary question for our consideration is whether or not the Secretary of Agriculture has attempted to exercise powers which Congress has not delegated to him. This involves a consideration of the rules and regulations promulgated by the Secretary of Agriculture and the statutory authority invoked to support such action, that is, the Agricultural Adjustment Act. The appellees also attack the constitutionality of the Agricultural Adjustment Act on the ground that Congress had no power to delegate to the Secretary of Agriculture authority to regulate the milk business within the Los Angeles Milk Shed for the reason that said business is not interstate commerce, and therefore the federal government being a government of delegated power cannot regulate it, whether acting by Congress or otherwise, and furthermore, that if Congress has power to regulate the milk business in the Los Angeles sales area it cannot delegate such legislative power to an executive officer.

If upon examination of the act we find that Congress has not attempted to delegate authority to the Secretary to regulate such business it will be unnecessary to consider the constitutional questions raised by appellees; we therefore proceed with that inquiry.

The jurisdictional claim of the Secretary of Agriculture in enforcing his milk license is fairly well shown in findings of the Secretary of Agriculture in connection with the order revoking the license of appellant Kurtz on July 28, 1934, as follows:

"(2) That the respondent [Kurtz] purchases fluid milk from producers in the Los Angeles Milk Shed and distributes said milk for consumption as fluid milk in the Los Angeles Sales Area. * * *

"(5) That in the marketing of fluid milk produced in the Los Angeles Milk Shed, and in the distribution of said fluid milk in the Los Angeles Sales Area, both interstate and intrastate commerce are so inextricably intermingled that said marketing and distribution of fluid milk in the Los Angeles Sales Area are in the current of interstate commerce. And further that intrastate commerce in such marketing and distribution of fluid milk in the Los Angeles Sales Area *affects, burdens, and competes with interstate commerce* in such marketing and distribution of fluid milk and of milk products in such a manner as to bring the distribution and marketing of fluid milk within said area in the current of interstate commerce and under the power of regulation vested in the Secretary of Agriculture by the Agricultural Adjustment Act, and the business of the respondent in the marketing and distribution of fluid milk within said area *is such as to bring him within the said current of interstate commerce.*" (Italics ours.)

The position of the Secretary of Agriculture and of his Department as further developed in the briefs and argument here-

in is in effect that in order to promote interstate commerce in milk products it is essential that the government fix the prices of milk products moving in interstate commerce, and that to do this it is essential that prices in local markets also be fixed because the price of milk in interstate commerce is dependent upon the prices in local or intrastate market. In order to avoid misunderstanding we quote some of the contentions along that line advanced by the appellants in their brief herein setting forth their position in that regard:

"All of the milk distributed in the Los Angeles Sales Area is in the current of interstate commerce, and hence the distribution of milk by appellees may be regulated under the Federal Commerce clause:

"It is our contention at this point that the power granted the Federal Government by the Commerce Clause of the Constitution extends to the regulation of the minimum price at which distributors may purchase milk from producers for distribution in the Los Angeles area, although the particular distributors regulated by the Los Angeles licenses do not themselves handle milk or dairy products which physically move in interstate commerce. This regulation is justified because the producer's price of fluid milk distributed in the urban markets of the country, of which Los Angeles is one, has a direct and immediate effect upon the vast movement of butter, cheese, and other dairy products in interstate commerce. Without such regulation it would be impossible to accomplish one of the chief purposes of the Agricultural Adjustment Act with respect to the dairy industry—the raising of the price received by the farmer for the milk which moves in interstate commerce in the form of dairy products.

"It is apparent that the Los Angeles market plays an important part in this nation-wide flow of dairy products in interstate commerce, for in each of the last four years, over 60 per cent of the butter and over 85 per cent of the cheese received at Los Angeles were produced outside of California. * * *

"The interrelationships which exist between the various usages of milk are such that fluctuations in the producer's price of market milk have a direct and immediate effect on the price received by the farmer for the vast amount of milk which is produced for conversion into butter, cheese, and other dairy products. The direct effect which fluctuations in the producer's price of market milk have upon the producer's price of milk processed into dairy products, which move in interstate commerce to every state in the country, becomes apparent when one considers the very high degree of correlation which exists between the prices of milk used for different purposes. * * *

"These remarkably close relationships between the prices received by producers for milk utilized in its various major uses exist because of the fact that dairy farmers can and do shift their milk among its various uses in response to fluctuations in the prices they receive, and this shifting tends, under normal conditions, to bring the prices of milk in its various uses into line with each other. * * *

"The conditions under which milk is produced and marketed make it inevitable that the farmer's price of manufacturing milk is directly and immediately affected by fluctuations in the farmer's price of milk produced for fluid consumption in the large cities of the country, of which Los Angeles is, of course, one. * * *

"The struggle of distributors to maintain sales in rapidly contracting markets has commonly resulted in price-cutting, price wars, and other destructive methods of competition. This competitive warfare among distributors has forced down the price received by dairy farmers for market milk, in many instances to price levels below that justified by the decrease in the demand for fluid milk and cream. Thus the California dairy farmer has been receiving, since 1932, considerably less for his milk than he received during the period August 1909–July 1914 the 'base period.' Between 1929 and 1932 the gross income of California dairy farmers from milk declined 35.4%. Throughout the nation the decline for this same period was 46%. * * *

"Market milk produced for the Los Angeles market is greatly in excess of the consumptive demand for milk in fluid form in that city. During 1933 the surplus milk received at the Los Angeles market and diverted into manufacturing channels averaged 20,000 gallons daily. * * *

"The fundamental purpose of the Agricultural Adjustment Act is to increase the price received by farmers for their products which move in interstate commerce. * * *

"The Los Angeles licenses are an integral part of a national program for the stabilization of the producer's price of milk by the issuance of licenses in all of the milk sheds of the country, pursuant to section 8 (3) of the Act. These licenses are calculated to eliminate price fluctuations in unstabilized fluid-milk markets caused by price wars, unwarranted price-cutting, and other destructive competition and are necessary in order to remove the burdens upon and obstructions to the free flow of butter and other manufactured dairy products in interstate commerce throughout the nation."

It thus clearly appears that the appellants assert the right of the Secretary of Agriculture to regulate the milk industry in the Los Angeles sales area because of the fact that the prices received in that area may affect the prices received by farmers for farm products in other states, and thus affect interstate commerce in the products manufactured from milk. If we turn from the briefs of counsel to the recitals in the regulations of the Secretary, we find the following statement of his purpose in adopting the regulations in the so-called license:

"Whereas it is provided by Sec. 8 of the Act [Agricultural Adjustment Act] as follows: [Here follows quotation of § 8, subs. (3) (4)] * * * Whereas, pursuant to said act and to said regulations, the Secretary has determined that it is necessary to issue licenses in order to eliminate unfair practices or charges that prevent or tend to prevent, (1) the effectuation of the declared policy of said act with respect to milk and its products, and (2) the restoration of normal economic conditions in the marketing of such commodity and the financing thereof; and

"Whereas, the Secretary, acting under the provisions of said act, for the purpose and within the limitations therein contained, after due notice and opportunity for hearing to interested parties given pursuant to the provisions of said act, and the regulations issued thereunder, and after due consideration, has on the 16th day of November, 1933, executed under his hand and the official seal of the Department of Agriculture a certain agreement entitled 'Marketing Agreement for Milk—Los Angeles Milk Shed,' and

"Whereas, the Secretary · finds that the marketing of milk for distribution as fluid milk in the Los Angeles Sales Area and distribution of said fluid milk are in both the current of interstate commerce and the current of intrastate commerce, which are inextricably intermingled,

"Now, therefore, the Secretary of Agriculture * * * hereby licenses each and every distributor of fluid milk for consumption in the Los Angeles Sales Area to engage in the handling in the current of interstate or foreign commerce of said fluid milk subject, * * * *" etc.

It is clear, then, that the Secretary of Agriculture has attempted to extend his power over intrastate commerce although the act of Congress under which he is operating permits him to license dealers engaged in the handling of interstate commerce only (section 8, subd. 3, supra). Unless the court can say that as a matter of fact the business transactions conducted by appellees involved in this action are a part of *interstate* commerce the Secretary of Agriculture has no authority to deal with the subject no matter how interrelated the interstate and intrastate commerce may be. Although there is power in the federal government over intrastate commerce in certain cases because of the relation of that commerce to interstate commerce, a delegation of power by Congress to the Secretary of Agriculture over interstate commerce only would not carry with it the corresponding power, if it exists, over intrastate commerce which Congress necessarily reserved when the powers delegated relate solely to interstate commerce.

It is true that the Congress, in authorizing the Secretary of Agriculture to issue licenses, used the same phrase used by the Secretary of Agriculture in his regulations with reference to goods "in the current of interstate or foreign commerce" (section 8, subd. 3, supra), but use of this phrase cannot extend the meaning of the words "interstate commerce." The phrase is restrictive rather than expansive in its effect, for the reason that the powers of Congress over interstate commerce are not limited to products moving in the current of interstate commerce. Congress recognizes this distinction for in amending section 8, subd. (2), April 7, 1934 (7 USCA § 608 (2), it authorizes marketing agreements with those handling agricultural commodities "in the current of *or in competition with, or so as to burden, obstruct, or in any way affect, interstate or foreign commerce.*" (Italics ours.) Section 8, subd. (3), was not amended to effect a similar purpose. This difference in language marks a defi-

nite change of thought. In dealing with the marketing agreements, the consent of Congress to such agreements was entirely unnecessary unless the agreement violated the anti-trust laws of the United States. The authority to the Secretary of Agriculture in relation to such agreements merely indicated the purposes for which he might promote, undertake, and bring about agreements between producers, while the licensing feature of the act was intended to compel obedience to the will of the Secretary as a condition of engaging in interstate commerce.

■ We conclude that Congress has limited its delegation of power to the Secretary of Agriculture to the licensing of foreign or interstate commerce, and that the appellees are not engaged therein, and hence are not bound to obey the regulations promulgated by the Secretary for the conduct of their wholly intrastate business, and that the interference of the appellants and each of them with said business is without warrant or authority in law. The views we have expressed are in accord with the views expressed by District Judge Chestnut in a recent case dealing with the same subject (Royal Farms Dairy, Inc., v. Wallace [D. C.] 8 F. Supp. 975); and District Judge Baltzell (U. S. v. Greenwood Dairy Farms, Inc. [D. C.] 8 F. Supp. 398).

■ Appellants' next contention is that the Secretary of Agriculture is an indispensable party to this action. The appellees are not seeking to establish their title to anything other than their right to conduct their business under the constitutional guarantee of freedom of the right to contract. The actions of the appellants who were seeking to carry out the regulations of the Secretary are not authorized by the act of Congress. The appellees are not engaged in "interstate commerce," and as to them the actions of the appellants constitute trespass. Under such circumstances the appellants cannot shield themselves behind the unauthorized regulations. The Secretary is not a necessary party. State of Colorado v. Toll, 268 U. S. 228, 45 S. Ct. 505, 69 L. Ed. 927, where Toll, the superintendent of a park, was seeking to enforce regulations of the Secretary of the Interior beyond the authority conferred by the act of Congress. Yarnell v. Hillsborough Packing Co. (C. C. A.) 70 F.(2d) 435.

■ Appellants claim that the questions presented by the appellees are moot because appellees have ceased to do business as distributors of milk in the Los Angeles sales area since the order of the Secretary of Agriculture revoking their licenses. They cite in support of their contention Mills v. Green, 159 U. S. 651, 16 S. Ct. 132, 40 L. Ed. 293; Brownlow v. Schwartz, 261 U. S. 216, 43 S. Ct. 263, 67 L. Ed. 620; Heitmuller v. Stokes, 256 U. S. 359, 41 S. Ct. 522, 65 L. Ed. 990; and similar cases. These cases are not applicable to the situation presented by the record in the case at bar. Here appellees still retain the money demanded by the appellant Los Angeles Milk Industry Board, and they allege that they desire to engage in the milk business as theretofore, and that they are prevented by the large penalties which would be incurred if the order of revocation is effective to make unlawful the conduct of such business by them. The case is not moot.

It is contended that the court had no power to enjoin the prosecution of an action brought in the state court by the Los Angeles Milk Industry Board after the institution of this action because of the prohibitions of 28 USCA § 379, as follows: "§ 379. Injunctions; stay in State courts. The writ of injunction shall not be granted by any court of the United States to stay proceedings in any court of a State, except in cases where such injunction may be authorized by any law relating to proceedings in bankruptcy."

■ This section has no application to injunctions such as the one involved here to protect the jurisdiction of the federal court where that jurisdiction had been invoked previous to the action in the state court. Garner v. Second Nat. Bank (C. C. A.) 67 F. 833. The appellants in their brief claim that no bond or security was required by the court as a condition for the issuance of the preliminary injunction. The trial court required the appellees to deposit about $25,000 with the clerk of the court, being the amount claimed by the appellants to be due under the license because of milk purchased by the appellees from producers. This was evidently intended as security in lieu of the bond or security required by 28 USCA § 382, and there is nothing in the record to indicate that this order was not satisfactory to the appellants or that further bond or security be required of appellees.

No other point raised is of sufficient importance to warrant further consideration.

There is no merit in the appellees' motion to dismiss.

Order affirmed.

GARRECHT, Circuit Judge (dissenting).

Some matters alluded to in the majority opinion may be elaborated to advantage. The California dairy farmer, as shown by the evidence, has been receiving since 1932 considerably less for his milk than he received during the "base period" defined by the Agricultural Adjustment Act, although the farmer's cost of living has been higher during the last few years than during such "base period." Between 1929 and 1932 the gross income of California dairy farmers from milk declined 35.4 per cent. Likewise, the sharp decrease in the purchasing power of the inhabitants of urban and industrial centers, such as Los Angeles, during the depression has greatly reduced the ability of the city population to purchase market milk. The struggle of distributors to maintain sales in these diminishing markets has resulted in price cutting and price wars. This warfare forced down the price received by dairy farmers for market milk. Similar practices prevailing throughout the country have brought about a shifting from the production of market milk to the production of manufacturing milk, for processing into butter and other products. It is testified that these conditions disturb the normal movement of dairy products in interstate commerce throughout the nation, and tend to reduce the national price of such dairy products. It is clear that the farmers' price of milk, employed in any one of its major uses, is closely interrelated with the price which farmers receive for milk employed in any other use. Therefore, as contended by appellants, the marketing conditions for fluid milk in the Los Angeles area affect in a direct and immediate manner the interstate movement of dairy products; and the price received by farmers for the vast amount of milk which is converted into dairy products.

The statistics in evidence show that most of the milk produced in the United States is consumed, not in the form of fluid milk and cream, but in the form of these other dairy products, such as butter and cheese, which are processed from milk. Over 58 per cent. of all the milk produced in this country (exclusive of that consumed on farms) is manufactured into such products. Most of the so-called manufactured milk which is processed into butter, cheese, evaporated milk and other milk products is produced in a few states and is transported to every state in the Union for consumption. An important part of this nation-wide flow of dairy products goes into the Los Angeles market in interstate commerce. In each of the last four years over 60 per cent. of the butter and over 85 per cent. of the cheese received at Los Angeles were produced outside of the state of California.

Then, too, dairy products produced from surplus milk compete directly with the dairy products produced from manufacturing milk and distributed in interstate commerce. This condition exists in Los Angeles. The testimony is that market milk produced for the Los Angeles market is greatly in excess of the consumptive demand for milk in fluid form in that city. During 1933 the surplus milk received at the Los Angeles market and diverted into manufacturing channels averaged 20,000 pounds daily. A considerable proportion of these dairy products manufactured in California are shipped in interstate commerce to the east and middle west for consumption. Thus, in 1932, 13 per cent. of the total United States production of evaporated milk was produced in California. In addition, there was shipped from the Los Angeles sales area in foreign commerce large quantities of cream, butter, cheese, malted milk, ice cream mix, evaporated milk, and powdered skim milk.

The direct effect which fluctuations in the producers' price of market milk have upon the producers' price of milk processed into dairy products which move in interstate commerce to every state clearly appears from this evidence, which shows the relationship existing between the price of milk used for different purposes. The interdependence of the farm price of butterfat and the farm price of fluid milk sold at wholesale is evident. The same is true of the relationship between the price of butterfat and the wholesale price of butter. The testimony further shows that the relationship between the farm price of butterfat and the price paid producers of milk sold for manufacture of condensed and evaporated milk is very close, not only for the nation as a whole, but for each geographical area in the country, so that fluctuations in the producers' price of milk produced for consumption in the Los Angeles area directly affects nation-wide interstate commerce

in dairy products and the prices received by farmers for the milk which goes into these dairy products.

Although the particular distributors interested in this action did not themselves handle milk or dairy products which physically moved in interstate commerce, it is plain that the regulation complained of is justified because the producers' price of fluid milk distributed in the urban markets of the country, of which Los Angeles is one, has a direct and immediate effect upon the vast movement of butter, cheese and other dairy products in interstate commerce.

The fundamental purpose of the Agricultural Adjustment Act is to increase the price received by farmers for their products which move in interstate commerce. With respect to the dairy industry, this purpose could not be achieved without regulating the distribution of fluid milk in markets such as Los Angeles, even though such milk distributed in such areas does not itself move in interstate commerce.

The question of price dominates trade between the states. The sale of milk in the Los Angeles area to that extent affects the country-wide price of milk, and thus affects interstate commerce.

A satisfactory price stabilization for milk and milk products cannot be achieved otherwise than through some plan such as outlined by the Secretary of Agriculture in the Agricultural Adjustment Act.

In its delegation of power to the Secretary of Agriculture the Congress did and intended to confer power upon the Secretary to effectuate the object to be attained, which included power over such intrastate commerce as was inextricably intermingled in the current of interstate commerce to the extent here shown.

To permit a few milk distributors operating in the Los Angeles sales area to enjoin the enforcement of the act as against them is to destroy the entire marketing plan, for it is obvious that any just and efficient plan for stabilization of market conditions cannot function if any small group in the industry is permitted to set it at naught.

The Supreme Court has sustained federal regulation of purely intrastate activities upon the ground that they burdened interstate commerce by adversely affecting the price of commodities which move in interstate commerce. Board of Trade of City of Chicago v. Olsen, 262 U. S. 1, 43 S. Ct. 470, 67 L. Ed. 839; Stafford v. Wallace, 258 U. S. 495, 42 S. Ct. 397, 66 L. Ed. 735, 23 A. L. R. 229.

There is another reason why this case should be reversed. Appellees have been conducting business under the Agricultural Adjustment Act and have accepted the benefits thereof. They have retained moneys collected under the authority of the act which admittedly is not theirs; they now seek to avoid accounting for this money by asserting that the act is unconstitutional. The temporary injunction granted in this case permits this procedure, which fails to find support either on sound morals or good law. One having accepted the benefits of a statute and having received money thereunder and for which he wrongfully refuses to account should not be permitted to restrain collection thereof by asserting the unconstitutionality of the law. By all principles of equity the money accepted by appellees under the act must be accounted for whether the act is constitutional or not. Wall v. Parrot Silver & Copper Co., 244 U. S. 407, 37 S. Ct. 609, 61 L. Ed. 1229; Booth Fisheries Co. v. Industrial Commission, 271 U. S. 208, 46 S. Ct. 491, 70 L. Ed. 908; North Dakota-Montana Wheat Growers' Ass'n v. United States (C. C. A. 8) 66 F.(2d) 573, 578, 579, 92 A. L. R. 1484.

The order granting an interlocutory injunction should be reversed.