## UNITED STATES v. GEARHART.
### No. 10309.

District Court, D. Colorado.

Aug. 8, 1934.

Thomas J. Morrissey, U. S. Atty., of Denver, Colo., and Byron G. Rogers, Asst. U. S. Atty., of Las Animas, Colo.

Scott W. Heckman, of Grand Junction, Colo., and R. H. Walker, of Denver, Colo., for Ballard Gearhart.

SYMES, District Judge.

This is a suit by the United States against one Ballard Gearhart, a lessee and operator of a coal mine in Mesa county, Colo., pursuant to the National Industrial Recovery Act, Public Act No. 67, 73d Congress, approved June 16, 1933, § 701 et seq., 15 USCA, and particularly section 3, tit. 1 thereof (15 USCA § 703).

After reciting that the President, pursuant to said act approved and promulgated a code of fair competition for the bituminous coal industry, effective October 2, 1933, the bill alleges that minimum prices for different grades and sizes of bituminous coal in the various consuming markets, to be received by producers of coal, were lawfully established. That the defendant during the past three years has been operating what is known as the Mount Garfield Mine, producing coal for sale, with a production of 7,000 tons yearly; that with full knowledge of the minimum prices so established he has, with intent and design to violate said minimum prices and the code, refused and failed to abide thereby, and has sold his product below the minimum price.

It is then alleged that the transactions by which the defendant has sold and is selling coal below the established minimum prices are transactions in interstate commerce; in that, the defendant has and will sell coal for transportation into the adjoining state of Utah. The bill further alleges that Colorado produces large quantities of coal, more than 20 per cent. of which is shipped outside the state in competition with coal produced in other states, and that the producers within the state must receive a fair market price in order to have coal available for interstate or foreign shipments, and that each ton of coal produced within the state has a direct relation to, and affects, every other ton of coal produced within or without Colorado. That the defendant's acts cause a general depression in prices of coal, encourage price-cutting in violation of the code, and destruction of the free flow of interstate commerce. The prayer is for the injunctive relief authorized by section 3 (c), tit. 1 of the act (15 USCA § 703 (c).

The answer admits generally the factual allegations of the bill, but denies the conclusions drawn therefrom. It specifically alleges that the defendant's sales and transactions are not interstate commerce. Admits full

knowledge of the code, but denies that his acts in any way affect interstate commerce. Alleges the National Industrial Recovery Act and the code, if applied to defendant's transactions are unconstitutional, and contravene section 1 of article 1, section 1 of article 2, and the Fifth, Ninth, and Tenth Amendments of the Federal Constitution.

It appears from the evidence that the defendant's mine is not situated upon a railroad, being known as a wagon mine. His sales are made only to cash purchasers at the mine, who take delivery thereof in their own trucks. When the coal is so loaded and paid the defendant's connection with the same ceases. Defendant does not directly or indirectly ship any coal himself or have anything to do with the ultimate destination of his product. Most of it is bought by his neighbors.

Appreciating the difficulties of supporting its allegations by direct testimony, the court admitted, over objection, practically everything plaintiff offered.

Affidavits and unverified statements of fact and conclusions of well-qualified experts were put in the record. These narrate the severe competition, lack of profits, low wages, intermittent work, and reduction in demand in the industry. Tables of statistics attached show the production, consumption, number of men employed, and wages paid in the industry throughout the country and in Colorado, and the decline in the production of bituminous coal during the last five or six years. In the opinion of these affiants there is need of federal regulation. They also call attention to, as one of the prime factors, "The revolutionary displacements of the demand and the outlets for coal, by reason of the developments of competitive fuels."

This reference is to oil and gas, as indicated by one statement, for example, that in 1918 bituminous coal supplied 72.3 per cent. of the total energy supply of the country, and only 44.9 per cent. in 1932. The figures for Colorado show a progressive decline in production from 9,920,700 tons in 1929 to 5,153,500 tons in 1933, or 48 per cent.; a reduction in the price realized over that period from $2.65 a ton to $2.10 a ton; a reduction of 26½ per cent. in the amount of the state's production used within the state, and a decline of 58½ per cent. in the amount shipped out of the state (Exhibit E). Another exhibit (H) gives the production of coal for the Western Slope District of Colorado— which includes the defendant's mine—showing a steady decline from 822,952 tons in 1921, to 584,426 tons for 1933.

A witness, Buchanan, a resident of Cisco, Utah, testified he drove his truck across the state line to the defendant's mine on two occasions, purchased coal, paid for and hauled it away himself, informing the defendant that he came from Utah and was taking the coal there. A competitor named Faris testified that he operated a wagon mine at Fruita, in the same general neighborhood as the defendant, and sold some coal to ranchers and farmers in Utah. That he had lost some business due, he thought, to the defendant's competition. Two operators of larger properties, Oliver and Bowie, who shipped by rail, testified that their sales had fallen off 10 to 15 per cent.; but there is nothing in their testimony to show that defendant caused either of them to lose business. In fact, Bowie testified that his so-called interstate business was greater in 1933 than in 1929.

The government expert, Mr. Marchand, a qualified and experienced coal operator, identified the exhibits already referred to. He frankly stated that the factors entering into the cost of production at any one mine are very numerous; that they vary between different districts and different mines in the same state; that there is no one factor—unless it is the wage scale—that even approaches being a controlling one; that one important item of cost is railroad rates, changes in which can either make or break the business of any particular mine, district, or state.

For the defense the defendant himself testified that he ships no coal himself, selling only to those who come to the mine with their own trucks and pay cash. That he has paid no attention to the code. His price has been $3.50 a ton since September, 1933, which is, roughly speaking, a dollar under the code minimum price.

The issues thus framed present squarely the question: Does the defendant's method of doing business, and the amount thereof, affect interstate commerce in such a manner and to such a degree, as to confer upon Congress the power to regulate the price he must ask and receive for his product?

The declaration of policy, National Industrial Recovery Act, section 1, tit. 1, Act of June 16, 1933, section 701, title 15 USCA; section 3 (b), title 15 USCA § 703 (b); section 3 (f), title 15 USCA § 703 (f); the definition of "interstate" and "foreign" commerce in section 7 (d), title 15 USCA § 707 (d), and other language found therein, make it clear that this act, and the powers sought to be exercised thereunder, are grounded on the commerce clause of the

Federal Constitution. Likewise the complaint is so drawn. See the discussion of Judge Knox in United States v. Spotless Dollar Cleaners (D. C.) 6 F. Supp. 725.

The language of the so-called interstate commerce clause of the Constitution, art. 1, § 8, cl. 3, is general in its terms, and has been provocative of as much if not more litigation than any other provision of that instrument. The authorities interpreting are almost without number, dealing with most every phase of the production of commodities, manufacturing, industry, and trade and commerce of the United States. Fortunately our inquiry requires us to examine only those few of the cases that directly concern coal mining. We resist the temptation to write a general dissertation upon this section or the economics of the New Deal.

Preliminarily, let it be said that the Supreme Court has never held that the power to regulate interstate commerce includes the power to regulate manufacturing or the production of commodities, even though they are intended for, and afterwards become the subject of interstate commerce. See United States v. E. C. Knight Co., 156 U. S. 1, 12, 15 S. Ct. 249, 253, 39 L. Ed. 325, wherein the court said: "That which belongs to commerce is within the jurisdiction of the United States, but that which does not belong to commerce is within the jurisdiction of the police power of the State. * * * Commerce succeeds to manufacture, and is not a part of it." Page 13 of 156 U. S., 15 S. Ct. 249, 254: "The fact that an article is manufactured for export to another state does not of itself make it an article of interstate commerce, and the intent of the manufacturer does not determine the time when the article or product passes from the control of the state and belongs to commerce." See, also, Chassanoil v. City of Greenwood, 291 U. S. 584, 54 S. Ct. 541, 78 L. Ed. 1004.

United Mine Workers v. Coronado Co., 259 U. S. 344, at page 407, 42 S. Ct. 570, 582, 66 L. Ed. 975, 27 A. L. R. 762, holds that: "Coal mining is not interstate commerce, and the power of Congress does not extend to its regulation as such." And quotes this statement from Hammer v. Dagenhart, 247 U. S. 251, at page 272, 38 S. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724: "The making of goods and the mining of coal are not commerce, nor does the fact that these things are to be afterwards shipped or used in interstate commerce make their production a part thereof." The court then observes that obstruction to coal mining is not a direct obstruction to interstate commerce in coal, although it may, of course, affect and reduce the amount of coal carried in that commerce. In qualifying the rule, the opinion declares Congress has the power to supervise and restrain recurring practices, even though they are not a part of interstate commerce, if it deems them likely to obstruct, restrain, or burden it, but in such a case, page 408 of 259 U. S., 42 S. Ct. 570, 582: "The intent to injure, obstruct, or restrain interstate commerce must appear as an obvious consequence of what is to be done, or be shown by direct evidence or other circumstances." And that obstruction of coal mining, though it may prevent coal from going into interstate commerce, is not a restraint, page 411 of 259 U. S., 42 S. Ct. 570, 583: "Unless the obstruction to mining is intended to restrain commerce in it, or has necessarily such a direct, material, and substantial effect to restrain it that the intent reasonably must be inferred."

The second time this case came before the Supreme Court, 268 U. S. 295, 45 S. Ct. 551, 69 L. Ed. 963, the court adhered to its former views of the law, but after considering the additional testimony produced at the second trial, arrived at a different conclusion on the facts. It added this statement, page 310 of 268 U. S., 45 S. Ct. 551, 556, pertinent to this discussion: "The mere reduction in the supply of an article to be shipped in interstate commerce by the illegal or tortious prevention of its manufacture or production is ordinarily an indirect and remote obstruction to that commerce." See, also, Oliver Iron Mining Co. v. Lord, 262 U. S. 172, 43 S. Ct. 526, 67 L. Ed. 929, and Delaware, L. & W. R. R. Co. v. Yurkonis, 238 U. S. 439, 35 S. Ct. 902, 59 L. Ed. 1397.

It is clear that the acts of the defendant, before they can be enjoined, must result in something more harmful than the mere reduction in the amount of coal available for shipment in interstate commerce, and that the intent to restrain the same must appear as a direct and obvious consequence of what has been done. The testimony already recited shows Gearhart had absolutely no intent to engage in, nor was he directly engaged in, interstate commerce; nor is he charged with working in concert with other producers. See Industrial Ass'n of San Francisco v. U. S., 268 U. S. 64, at page 77, 45 S. Ct. 403, 406, 69 L. Ed. 849: "Interstate commerce—indeed, commerce of any description—was not the object of attack, 'for the sake of which the several specific acts and courses of conduct were done and adopted.'"

This leaves only the inquiry: Does his desultory production of 7,000 tons of coal a year—of which only a few truckloads are hauled out of the state, and its sale for less than the code prices—affect interstate commerce in the way and to the extent necessary to justify federal regulation? The evidence is that it is negligible when compared to either the total production of Colorado, or to the amount of that production shipped out of the state. Or, to make the illustration more concrete, let us contrast it with the total tonnage of what is described in the exhibits as the Western Slope District, cut off, as it is, by natural barriers from the rest of the state, and where, according to Exhibit L, mining conditions and costs are comparable between the defendant and other producers therein. The figures cited show that the defendant's production is, roughly, only 1 per cent. of the average of that district for the past twelve years—a negligible factor according to the first Coronado Case, supra, 259 U. S. 344, at page 412, 42 S. Ct. 570, 66 L. Ed. 975, 27 A. L. R. 762.

Furthermore, the record is wholly devoid of testimony that the defendant's price caused in the slightest degree a reduction in total tonnage and price realized for coal in the district, the state, or nation as charged. the contrary, it is established that the desperate condition of the bituminous coal industry in Colorado and the United States is due to a variety of other causes, such as natural gas (now displacing coal in Denver and other cities in Colorado), oil, hydro-electric power, etc.

No causal connection is shown between the acts of the defendant and the present condition of the industry. A finding that the defendant was in any way responsible therefor would be based on surmise only.

The government relies upon the line of authorities of which the Shreveport Case, 234 U. S. 342, 34 S. Ct. 833, 58 L. Ed. 1341, and Stafford v. Wallace, 258 U. S. 495, 42 S. Ct. 397, 66 L. Ed. 735, 23 A. L. R. 229, are examples. These hold the power of Congress extends to matters of local concern, which in fact unduly burden interstate commerce. The Shreveport Case, for instance, held that whenever the interstate and the intrastate transactions of carriers are so related that the government of one involves the control of the other, Congress, and not the state, is entitled to prescribe the final and dominant rule, and it may control intrastate transactions of interstate carriers in so far as they affect interstate commerce, and may control intrastate charges of an interstate carrier to the extent necessary to prevent injurious discrimination against interstate commerce.

In Stafford v. Wallace, supra, the Supreme Court had under consideration the Packers and Stockyards Act of 1921 (7 USCA § 181 et seq.), providing for the supervision by federal authority of the business of commission men and live stock dealers in the great stockyards of the country. The court found that the shipment of live stock, originating in the West, and consigned to commission merchants at Chicago, etc., who sell it to the packers and dealers at the stockyards, and the dealers, in reselling to stock farmers and feeders, is a continuous movement, and that the local transactions in the stockyards do not interrupt this current, but, on the contrary, are indispensable to its continuity. And, citing Swift & Co. v. U. S., 196 U. S. 375, 25 S. Ct. 276, 49 L. Ed. 518, held it subject to national regulation. One difference between this case and the one at bar is that the producer of the cattle in the West was the consignor and retained title while they were moving in interstate commerce. Other distinctions are pointed out in Ryan v. Amazon Petroleum Corp. (C. C. A.) 71 F. (2d) 1.

It is true that in the so-called "Milk Case," Nebbia v. New York, 291 U. S. 502, 54 S. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469, the Supreme Court held that the police power of a state to regulate business in the public interest includes the fixing of prices for commodities; that price regulation in a proper case may be a reasonable and appropriate means of rectifying the evil sought to be corrected. It must be borne in mind, however, that that case tested the police powers of the state and not those of the federal government. The police power of the former is plenary, and the federal courts interfere only when the state, in the exercise thereof, violates some specific restraint found in the Federal Constitution.

The Fifth Amendment is, of course, a limitation on the powers of the federal government and while, as stated in the Milk Case, supra, page 536 of 291 U. S., 54 S. Ct. 505, 515: "The function of courts in the application of the Fifth and Fourteenth Amendments is to determine in each case whether circumstances vindicate the challenged regulation as a reasonable exertion of governmental authority or condemn it as arbitrary or discriminatory." And, page 535 of 291 U. S., 54 S. Ct. 505, 515: "The private character of a business does not necessarily remove it from the realm of regulation of charges or prices."

In applying this rule, however, to a case in which the regulatory power of the federal government is challenged, it must be borne in mind that the latter has· no general police powers, but only such as are specifically enumerated in the Constitution, and that the Ninth and Tenth Amendments reserve all others to the states or the people.

I decide, therefore, that the particular acts and conduct of the defendant here complained of do not restrain or burden interstate commerce and are not subject to federal regulation. Injunctive relief is denied and the bill dismissed.

Findings of fact, conclusions of law, and a decree in accordance herewith may be submitted.