**COLUMBUS MILK PRODUCERS' CO-OP. ASS'N et al. v. WALLACE et al. (MEADOWMOOR DAIRIES, Inc., Intervener).**

No. 13985.

District Court, N. D. Illinois, E. D.

Nov. 21, 1934.

Joseph R. Roach and Joseph E. Green, both of Chicago, Ill., for plaintiffs and intervener.

Dwight H. Green, U. S. Dist. Atty., of Chicago, Ill., and Harold M. Stephens and A. H. Feller, Asst. Attys. Gen., for defendants.

BARNES, District Judge.

This case came before the court upon a final hearing upon the merits.

Plaintiffs are seeking a permanent injunction, restraining the defendants from enforcing the Chicago milk license. The defendants, Secretary Wallace and United States District Attorney Green, are seeking a permanent injunction restraining the plaintiffs from violating the terms and conditions of the Chicago milk license.

The case has been heard upon a stipulation of facts. The original plaintiffs are the Columbus Milk Producers' Co-operative Association, a Wisconsin corporation, and one-hundred twenty individual dairy farmers who are members of the plaintiff association. The intervener is Meadowmoor Dairies, Inc., which has intervened in this cause as a party plaintiff. It is an Illinois corporation and has its place of business in the city of Chicago, in said state. The defendants are Henry A. Wallace, Secretary of Agriculture, Homer J. Cummings, Attorney General of the United States, Dwight H. Green, United States District Attorney for the Northern District of Illinois, and Frank C. Baker, market administrator for the Chicago sales area under the Chicago license for milk.

It has been stated that the basic issues in this case presented to this court, broadly stated, are: First, whether the Chicago milk license is legally valid; and, second, whether it is applicable to the plaintiff association and the intervener.

The individual plaintiffs are dairy farmers residing in Wisconsin. They are each members of, and stockholders in, the plaintiff association. They produce milk on their farms, transport it to the plant of the plaintiff association, located in the town of Astico, Wis., and there sell it to the plaintiff association. Prior to the enactment of the Agricultural Adjustment Act (7 USCA § 601 et seq.), the individual plaintiffs and the plaintiff association entered into contracts, whereby each of the individual plaintiffs receives from the plaintiff association the average price received by the association for milk of a similar quality sold by it during the same

period, less deductions for the operating expenses of the plaintiff association. Prior to the enactment of the Agricultural Adjustment Act, the plaintiff association entered into a contract with the intervener whereby the plaintiff association obligated itself to sell to the intervener all the milk which it received from the individual plaintiffs. This contract is still in force, and by its terms the plaintiff association is to receive from the intervener a price equal to the average current price paid for milk by three Wisconsin condenseries, plus 40 cents per hundred weight. The intervener transports the milk purchased by it from the plaintiff association from Astico, Wis., to the plant of the intervener in Chicago, where all of said milk is sold by the intervener and consumed in fluid form as class I milk as defined in the license.

The plaintiff association and the intervener are distributors, as defined in the license, and are required by the license to pay for milk purchased by them in accordance with its terms. Neither the plaintiff association nor the intervener has complied with the provisions of the license with respect to the purchase of milk by them.

The court is of the opinion that there is no material difference in principle between this case and the case of Edgewater Dairy Co. v. Wallace, 7 F. Supp. 121, decided by this court in June, 1934.

In the Edgewater Dairy Case the milk was produced, sold, and consumed within the state of Illinois. In this case, the milk is produced in the state of Wisconsin, transported by the producers to the plant of the plaintiff Columbus Milk Producers' Association in the town of Astico, Wis., and there sold to the plaintiff association. After being processed by plaintiff association, the milk is sold by the association to other distributors, including the intervener, Meadowmoor Dairies, Inc., who call for it at the plant of the association. The production, transportation from farm to dairy plant, and transfer of title from producer to distributor all take place within the state of Wisconsin.

The defendants contend that, upon the stipulated facts, both the plaintiff association and the intervener are actually engaged in interstate commerce. The court is of the opinion that the defendants are correct in this contention, but is further of the opinion that this is immaterial.

Defendants further contend that the entire Chicago sales area with respect to milk is "in the current of interstate commerce." The court does not believe that this contention is well founded, but further believes that whether the entire Chicago sales area with respect to milk is "in the current of interstate commerce" is immaterial.

As stated in the memorandum in the Edgewater Dairy Case, the milk license, in the opinion of this court, has three purposes: First, to fix the minimum price at which the producers may sell their product; second, to limit the production of milk by means of assigning to producers thereof so-called "bases"; and, third, to charge the cost of administration under the license to producers.

The fact that an article is produced for export to another state does not of itself make it an article of interstate commerce within the meaning of section 8, art. 1, of the Constitution. The power to regulate interstate commerce or transactions affecting interstate commerce does not embrace the power to regulate the production of articles intended for commerce. In Heisler v. Thomas Colliery Co., 260 U. S. 245, 259, 43 S. Ct. 83, 86, 67 L. Ed. 237, it is said:

"* * * We can estimate the contention made. It is that the products of a state that have, or are destined to have, a market in other states are subjects of interstate commerce, though they have not moved from the place of their production or preparation.

"The reach and consequences of the contention repel its acceptance. If the possibility, or indeed certainty, of exportation of a product or article from a state determines it to be in interstate commerce before the commencement of its movement from the state, it would seem to follow that it is in such commerce from the instant of its growth or production, and in the case of coals, as they lie in the ground. The result would be curious. It would nationalize all industries, it would nationalize and withdraw from state jurisdiction and deliver to federal commercial control the fruits of California and the South, the wheat of the West and its meats, the cotton of the South, the shoes of Massachusetts and the woolen industries of other states at the very inception of their production or growth, that is, the fruits unpicked, the cotton and wheat ungathered, hides and flesh of cattle yet 'on the hoof,' wool yet unshorn, and coal yet unmined, because they are in varying percentages destined for and surely to be exported to states other than those of their production. However, we need not proceed fur-

ther in speculation and argument. Ingenuity and imagination have been exercised heretofore upon a like contention. * * *" (Italics are this court's.)

In Hammer v. Dagenhart, 247 U. S. 251, 272, 38 S. Ct. 529, 531, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724, it is said: "Over interstate transportation, or its incidents, the regulatory power of Congress is ample, but the production of articles, intended for interstate commerce, is a matter of local regulation." See, also, United States v. E. C. Knight Co., 156 U. S. 1, 15 S. Ct. 249, 39 L. Ed. 325; Kidd v. Pearson, 128 U. S. 1, 9 S. Ct. 6, 32 L. Ed. 346; Chassaniol v. Greenwood, 291 U. S. 584, 54 S. Ct. 541, 78 L. Ed. 1004; Hart Coal Corp. v. Sparks (D. C.) 7 F. Supp. 16, 22.

The views of this court in respect of the validity of the Chicago milk license are stated with some particularity in a memorandum which was filed in the Edgewater Dairy Case, supra. Perhaps a further word should be said concerning the "bases" by said license provided to be assigned to producers. The court is of the opinion that it appears from the milk license in question that the principal purpose of the provisions therein relating to "bases" is to limit the production of milk. Unless a dairy farmer has had assigned to him a "base," the milk produced upon his dairy farm cannot be sold in a district for which a license has been promulgated. It is said, on behalf of the defendants, that the milk may be sold outside of such districts. But, assuming that there are districts for which licenses have not been promulgated and that there will continue for all time to be such districts (which is a violent assumption), still the provisions of the license in respect of "bases" is a limitation upon production.

It is the court's opinion that the milk license in question is invalid because of lack of authority in the Secretary of Agriculture and in Congress to regulate the production of milk.

Having determined that the Chicago milk license is not valid, it is unnecessary to consider the question as to whether the license is applicable to the plaintiff association and the intervener.

The motion of the plaintiffs and the intervening petitioner for an injunction will be granted, and that of the cross-plaintiffs for an injunction will be denied.

Counsel may prepare, and on due notice present, a draft of an appropriate order.