**UNITED STATES et al. v. SEVEN OAKS DAIRY CO.**

**UNITED STATES et al. v. WESTWOOD FARM MILK CO., Inc.**

Nos. 4068, 4069.

District Court, D. Massachusetts.

May 17, 1935.

996

Harold M. Stephens, Asst. Atty. Gen., and Francis J. W. Ford, U. S. Atty., and Joseph J. Hurley, Asst. U. S. Atty., both of Boston, Mass., and Mac Asbill and A. H. Feller, Sp. Assts. to Atty. Gen., and Jerome N. Frank, Gen. Counsel, Agricultural Adjustment Administration, John J. Abt, Chief of Litigation Section, Agricultural Adjustment Administration, and Thomas J. Flavin and Alexander M. Wilding-White, Attys., Agricultural Adjustment Administration, all of Washington, D. C., for plaintiff.

David Greer, of Boston, Mass., for defendant.

BREWSTER, District Judge.

The above suits in equity are brought against two defendants who have refused to comply with a federal milk license. The

Secretary of Agriculture would restrain them from carrying on the milk business in which they are respectively engaged. The proceedings were heard on the merits upon substantially identical stipulations. In each case the stipulation, entitled "Stipulation of Evidence," contained certain agreements as to facts and statements of testimony which witnesses would have given if called upon to testify. These statements of evidence were not contradicted and the stipulations, so far as material, may be taken as findings of fact by the court and, by reference, may be incorporated as part of my statement of facts. In order to understand the issues of law involved, it will be necessary to summarize the essential facts which appear in the following:

## Statement of Facts.

1. Each defendant is a Massachusetts corporation with a principal place of business within the area covered by the license hereinafter referred to, and each is engaged in the business of distributing milk within that area.

2. On March 15, 1934, acting under the authority conferred upon him by section 8 (3) of the Act of May 12, 1933, 7 USCA § 608 (3), the Secretary issued license No. 38, being a license for milk for the Greater Boston Market, which included within its territory the city of Boston and other cities and towns in the Metropolitan District.

In the license it is recited that, "Whereas, the Secretary finds that the marketing of milk for distribution in the Greater Boston Market and the distribution thereof are entirely in the current of interstate commerce because the said marketing and distribution are partly interstate and partly intrastate commerce and so inextricably intermingled that the said interstate commerce portion cannot be effectively regulated or licensed without licensing that portion which is intrastate commerce. * * *"

The Secretary licensed each and every distributor to engage in the business of distributing, marketing, or handling milk or cream as a distributor in the Greater Boston Market, subject to the terms and conditions set forth in the license, the marketing plan and the rules for the establishment of bases. These terms and conditions are elaborate and complicated. However, it is not necessary to more than outline the plan of regulating the milk industry and to state the purposes of the license. Because of the daily fluctuation in the quantities of milk sold as fluid or whole milk, and the quantities used for other purposes, and because the price received by distributors for milk sold in fluid form is materially in excess of the price received for milk applied to other purposes, the Secretary has seen fit to divide milk, for the purposes of the regulation, into two classes: Class 1 milk being milk distributed as whole milk, and class 2 milk being milk sold for other purposes, and he has established a price for each class. In order to prevent inequalities, which would arise among producers whose income would otherwise depend upon the quantities of milk sold by the distributor as class 1 milk, there has been incorporated in the license a somewhat elaborate scheme for equalizing, or stabilizing, the price which the producer is to receive, called the "blended price." There is also an attempt to regulate quantities of milk to be produced by establishing base quantities. There are provisions whereby a distributor who sells class 1 milk in excess of the base quantity shall distribute the gain among those distributors who sell less quantity of class 1 milk, and to that end such distributor is required to pay to the market administrator balances on adjusted accounts, which sums are paid out pro rata among the distributors entitled to receive adjustments. It is also provided that each distributor shall deduct 2 cents per 100 pounds of milk from the payments to be made by him to the producer and shall pay the amount so deducted to the market administrator to be used in paying the expenses of administering the license.

The tenth paragraph of the license reads as follows: "10. If any provision of this license is declared invalid, or the applicability thereof to any person, circumstance, or thing is held invalid, the validity of the remainder of this License and/or the applicability of any provision of this License to any other person, circumstance, or thing, shall not be affected thereby."

The license has been amended several times since it was first issued, but none of the amendments are material to any issue in this case.

3. Each of the defendants at all times since the issuing of the license has been continuously engaged in the business of purchasing milk from the producers thereof in the state of Vermont, transporting the milk into the commonwealth of Massa-

chusetts, and distributing it in the Greater Boston Market. Each defendant buys all of its milk in Vermont with the intention of shipping it into Massachusetts for sale in the Greater Boston Market. The milk produced in Vermont is delivered, except in a small number of cases, to its receiving station in Newport, Vt., in cans belonging to the producer. This milk is then dumped, tested, weighed, and cooled. Some of the milk is separated, and the cream obtained therefrom, together with the remainder of the milk, is placed in cans belonging to the defendants and shipped by them in interstate commerce into Massachusetts within forty-eight hours after its receipt by the defendants.

The defendant Seven Oaks Dairy Company distributed daily approximately 1.32 per cent. of the total distribution of milk and cream in the Greater Boston Market, and the defendant Westwood Farm Milk Company, Inc., distributed .248 per cent. of the total distribution of such milk and cream. It has appeared in evidence that 90 per cent. of all milk distributed in the Greater Boston Market originates outside of the commonwealth of Massachusetts.

4. Each of the defendants, after due notices and hearing held in compliance with regulations issued by the Secretary of Agriculture, has been found to have violated the terms and conditions of the license, whereupon the Secretary of Agriculture issued an order revoking the license as to each defendant. Since the revocation of the license, the defendants have continued to engage in the business of distributing milk in the Greater Boston Market, but since December 6, 1934, each has been conducting its business in accordance with the terms of a temporary restraining order issued by this court in these proceedings.

5. The testimony of the economic adviser to the Agricultural Adjustment Administration, which was not altogether material to the legal issues involved, may be briefly summarized as follows: It showed that the price of milk to producers had steadily declined from 1929 to 1934; that a wide disparity existed between the price received by the farmer for his product and the price paid for commodities which he purchased; that in New England the dairy industry produces a substantial part of the total income for farmers. It also appeared from this testimony that the plan embodied in the license, namely, the classified price

plan and the base surplus plan, had been in operation for some period of time prior to the enactment of the Agricultural Adjustment Act (7 USCA, § 601 et seq.), not only in the Greater Boston Market but in other parts of the United States.

Conclusions of Law.

At the outset it may be well to dispose of the defendants' argument that the Agricultural Adjustment Act is unconstitutional, as unlawfully delegating legislative powers to the Secretary of Agriculture.

The question of the constitutionality of the enactment was considered in the case of Franklin Process Co. v. Hoosac Mills Corporation (D. C.) 8 F. Supp. 552. In that case the conclusion was reached that, while Congress had approached the limits of its power to regulate matters of local concern, the unconstitutionality was not so clear as to warrant a District Court in declaring the act void. The issue was so recently considered in the opinion in the Hoosac Mills Corporation Case that it is not necessary to repeat here the reasons upon which the conclusion was based or the authority cited in its support. It is to be noted, however, that in the opinion it was observed that the court was considering the law as it was written, and that it did not undertake to pass upon the validity of the law as it might be interpreted, or applied, by administrative officers acting under color of its provisions. It was there said, 8 F. Supp. 552, page 561: "It is conceivable that the power to license may be exercised through the imposition of conditions in such a way that the regulation would be beyond the scope of the legitimate powers of Congress under the commerce clause."

It must be assumed, I take it, that the plaintiff may not prevail in these proceedings to enjoin the defendants from continuing in the business of milk distributors in the Greater Boston area if the plaintiff has imposed upon the defendants a license, the conditions of which do not fall within the authority conferred upon the Secretary of Agriculture by the Agricultural Adjustment Act, or within the constitutional powers of the national government.

Section 8 (3) (4) of the Act (48 Stat. 35, 7 USCA § 608 (3, 4), provides as follows:

"Sec. 8. (3) To issue licenses permiting processors, associations of producers,

and others to engage in the handling, in the current of interstate or foreign commerce, of any agricultural commodity or product thereof, or any competing commodity or product thereof. Such licenses shall be subject to such terms and conditions, not in conflict with existing Acts of Congress or regulations pursuant thereto, as may be necessary to eliminate unfair practices or charges that prevent or tend to prevent the effectuation of the declared policy and the restoration of normal economic conditions in the marketing of such commodities or products and the financing thereof. The Secretary of Agriculture may suspend or revoke any such license, after due notice and opportunity for hearing, for violations of the terms or conditions thereof. Any order of the Secretary suspending or revoking any such license shall be final if in accordance with law. Any such person engaged in such handling without a license as required by the Secretary under this section shall be subject to a fine of not more than $1,000 for each day during which the violation continues.

"(4) To require any licensee under this section to furnish such reports as to quantities of agricultural commodities or products thereof bought and sold and the prices thereof, and as to trade practices and charges, and to keep such systems of accounts, as may be necessary for the purpose of part 2 of this title [sections 608 to 619 of this chapter]."

■ By virtue of this statute the license in question was issued. It was issued generally and not specifically to defendants. Its terms are broad enough to embrace distributors who are doing only intrastate business, although the statute expressly limits the power to those who are engaged in interstate commerce. Justification for this broad sweep is attempted in the recital that intrastate commerce is so inextricably intermingled with interstate commerce that it is necessary to license those not engaged in handling in the course of interstate commerce. Similar recitals in milk licenses have failed to impress courts in other jurisdictions. With a single exception, so far as my examination has gone, all are agreed that the Secretary is without authority to impose his licensing power upon a distributor who does not go outside of the state for his supply. Berdie et al. v. Kurtz et al. (C. C. A.) 75 F.(2d) 898; Edgewater Dairy Co. v. Wallace (D. C.) 7 F. Supp. 121; Hill v. Darger et al. (D. C.) 8 F. Supp. 189; Douglas v. Wallace (D. C.) 8 F. Supp. 379; United States v. Greenwood Dairy Farms (D. C.) 8 F. Supp. 398; United States v. Neuendorf (D. C.) 8 F. Supp. 403; Royal Farms Dairy v. Wallace (D. C.) 8 F. Supp. 975, 984; Columbus Milk Producers' Co-op. Association v. Wallace (D. C.) 8 F. Supp. 1014. See, also, United States v. Sutherland (D. C.) 9 F. Supp. 204; United States v. Superior Products, Inc., et al. (D. C.) 9 F. Supp. 943.

■ I am entirely in accord with this overwhelming weight of authority and am prepared to rule that the scope of the license issued to the milk dealers of the Greater Boston area was beyond the authority conferred upon the Secretary of Agriculture by the statute.

Whether the defendants in these cases fall within the category of those who are engaged in the handling in the current of interstate commerce of an agricultural commodity is a matter not entirely free from doubt.

■ It is settled law that the purchase of a commodity in one state for the purpose of transporting it to another state is a transaction in interstate commerce within the Commerce Clause of the Constitution (article 1, § 8, cl. 3) and not subject to burdens imposed by state regulations. Dahnke-Walker Milling Co. v. Bondurant; 257 U. S. 282, 42 S. Ct. 106, 66 L. Ed. 239; Lemke v. Farmers' Grain Co., 258 U. S. 50, 42 S. Ct. 244, 66 L. Ed. 458; Shafer v. Farmers' Grain Co., 268 U. S. 189, 45 S. Ct. 481, 69 L. Ed. 909; Swift & Co. v. United States, 196 U. S. 375, 25 S. Ct. 276, 49 L. Ed. 518; Stafford v. Wallace, 258 U. S. 495, 42 S. Ct. 397, 66 L. Ed. 735, 23 A. L. R. 229; United States v. Whiting. (D. C.) 212 F. 466.

■ The purchase is none the less a part of the interstate commerce because of the method of receiving deliveries adopted by the defendants. The intermediate deliveries by the purchasers to the defendants' receiving station did not end the movement of the commodity. "It was merely halted as a convenient step in the process of getting it to its final destination." Binderup v. Pathé Exchange, 263 U. S. 291, 309, 44 S. Ct. 96, 99, 68 L. Ed. 308. See, also, Swift & Co. v. United States, supra; Stafford v. Wallace, supra; Baldwin v. Seelig, 55 S. Ct. 497, 501, 79 L. Ed. ——, decided March 4, 1935; Hughes Bros. Timber Co.

v. State of Minnesota, 272 U. S. 469, 47 S. Ct. 170, 71 L. Ed. 359.

One of the dominant purposes of the license is to regulate the production of milk by establishing bases of production. The production of milk is a business which bears no substantial relation to interstate commerce, and whatever power to regulate may be exerted upon the industry resides in the reserved power of the state and is not found among any granted powers of the national government. Crescent Cotton Oil Co. v. State of Mississippi, 257 U. S. 129, 42 S. Ct. 42, 66 L. Ed. 166; Heisler v. Thomas Colliery Co., 260 U. S. 245, 43 S. Ct. 83, 67 L. Ed. 237; United States v. E. C. Knight Co., 156 U. S. 1, 15 S. Ct. 249, 39 L. Ed. 325; United Mine Workers v. Coronado Coal Co., 259 U. S. 344, 42 S. Ct. 570, 66 L. Ed. 975, 27 A. L. R. 762; Chassaniol v. City of Greenwood, 291 U. S. 584, 54 S. Ct. 541, 78 L. Ed. 1004; Edgewater Dairy Co. v. Wallace, supra.

In other jurisdictions similar milk licenses have been deemed unenforceable on the ground that Congress is without power to regulate production of milk. Edgewater Dairy Co. v. Wallace, supra; Columbus Milk Producers' Co-op. Association v. Wallace, supra.

These cases are consistent with the views of this court as expressed in the Hoosac Mills Corporation Case, supra, where it was observed that there were limitations upon the commerce powers of the national government, and that these commerce powers "could not be extended to reach a crop of wheat or cotton, notwithstanding the farmer may have intended to introduce it into the channels of commerce. If, therefore, Congress had undertaken by coercive measures to regulate the amount of wheat or cotton a farmer should produce, a serious constitutional question would arise whether Congress had not extended the frontier of federal bureaucratic activities too far."

Assuming, for the purposes of the cases, that the defendants were subject to regulations under section 8 (3) (4), the first question presented is whether the license is wholly vitiated by the attempt to extend its operation and its conditions beyond the authority of the Secretary. In the Trade-Mark Cases, 100 U. S. 82, 25 L. Ed. 550 Congress attempted, under the commerce clause, to regulate the use and registration of trade-marks, without limiting the act, to those engaged in interstate commerce. It was held that the whole act fell as unconstitutional. The argument that the act be deemed valid in its application to trade-marks used in interstate commerce was rejected upon the authority of United States v. Reese, 92 U. S. 214, 23 L. Ed. 563. In that case the court, in dealing with a statute enacted by Congress, in language broad enough to cover acts without, as well as within, the constitutional jurisdiction, said, 92 U. S. 214, page 221, 23 L. Ed. 563: "We are not able to reject a part which is unconstitutional, and retain the remainder, because it is not possible to separate that which is unconstitutional, if there be any such, from that which is not. The proposed effect is not to be attained by striking out or disregarding words that are in the section, but by inserting those that are not now there. Each of the sections must stand as a whole, or fall altogether."

In Hill v. Wallace, 259 U. S. 44, 42 S. Ct. 453, 459, 66 L. Ed. 822, the court refused to uphold any part of the Future Trading Act of August 24, 1921 (42 Stat. 187), although it contained a saving clause practically identical with the tenth section of the license quoted in the findings of fact in paragraph 2. The court cited both the Reese and the Trade-Mark Cases and, referring to the saving clause, said: "Section 11 did not intend the court to dissect an unconstitutional measure and reframe a valid one out of it by inserting limitations it does not contain. This is legislative work beyond the power and function of the court." See, also, Railroad Retirement Board et al. v. Alton Railroad Co. et al., 55 S. Ct. 758, 79 L. Ed. ——, decided May 6, 1935.

I see no reason why the same doctrine should not be applied to administrative regulations. In order to sustain the validity of the license involved in this case, it would be necessary to read into it words of limitation which are not there. The court has no more authority to rewrite the terms of a license than it would have to rewrite the statute. In thus attempting to impose regulation upon those not within the reach of his authority, the Secretary has now no just grounds on which to maintain his suits against these defendants.

Furthermore, by exerting his authority to license, the Secretary has undertaken to fix the price which the defendants shall pay for their supply of milk.

Does the statute, which is the source of the Secretary's authority to regulate the milk industry, empower him to prescribe the price which these defendants must pay for their commodity?

■■■■ Neither the control of production nor the price paid producers can be deemed to be reasonable conditions necessary to "eliminate unfair practice." Conceding that the Secretary of Agriculture in the first instance is to apply the term "unfair practice," ultimately the question becomes a judicial one. Federal Trade Commission v. R. F. Keppel & Bro., 291 U. S. 304, 54 S. Ct. 423, 78 L. Ed. 814; Royal Farms Dairy v. Wallace, supra.

■■ In the last-cited case it was said that "trade practices of buying a common article of commerce from willing vendors at a price fairly arrived at by mutual agreement" could not be found to be unfair. The soundness of this statement cannot be successfully challenged.

■■ It is obvious that Congress was invoking its power to regulate commerce between the states when it enacted section 8 of the Agricultural Adjustment Act (7 US CA § 608). If the power to fix prices, in the circumstances here disclosed, cannot be brought within the constitutional grant under the Commerce Clause, it is to be presumed that Congress never intended to grant such power to the Secretary. This is only recognizing the presumption that a statute of the legislative branch is a constitutional enactment. Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77; Erie Railroad Co. v. Williams, 233 U. S. 685, 34 S. Ct. 761, 58 L. Ed. 1155, 51 L. R. A. (N. S.) 1097; Mountain Timber Co. v. State of Washington, 243 U. S. 219, 37 S. Ct. 260, 61 L. Ed. 685, Ann. Cas. 1917D, 642.

■■■ But no such presumption can be indulged with respect to administrative regulations when they seriously cut down the rights of individuals to conduct an innocent business in a manner which involves no consequences injurious to public interests. On the contrary, the burden rests heavily on plaintiffs to remove substantial doubts respecting the authority of the Secretary of Agriculture, especially since the act fails in express terms to delegate to him authority to fix prices as a condition of his license. This omission in the act has been deemed adequate grounds for denying the existence of any such authority in a well-considered opinion of Judge Ches-

nut in Royal Farms Dairy v. Wallace, supra.

■■ My examination of the adjudicated cases dealing with both state and national legislation designed to regulate prices strengthens my conviction that authority for the regulation of the price which these defendants, in order to continue a business, must pay their producers in Vermont, cannot be found either in the act or in the Commerce Clause of the Constitution.

State statutes regulating prices have been struck down in several instances because they were held to contravene the due process clause of the Fourteenth Amendment. Ribnik v. McBride, 277 U. S. 350, 48 S. Ct. 545, 72 L. Ed. 913, 56 A. L. R. 1327; Chas. Wolff Packing Co. v. Court of Industrial Relations of Kansas, 262 U. S. 522, 43 S. Ct. 630, 67 L. Ed. 1103, 27 A. L. R. 1280; Tyson & Brother United Theatre Ticket Offices v. Banton, 273 U. S. 418, 47 S. Ct. 426, 428, 71 L. Ed. 718, 58 A. L. R. 1236; Williams v. Standard Oil Co. of Louisiana, 278 U. S. 235, 49 S. Ct. 115, 73 L. Ed. 287, 60 A. L. R. 596; Fairmont Creamery Co. v. State of Minnesota, 274 U. S. 1, 47 S. Ct. 506, 71 L. Ed. 893, 52 A. L. R. 163; New State Ice Co. v. Liebmann, 285 U. S. 262, 52 S. Ct. 371, 76 L. Ed. 747.

And where the business involved interstate commerce, state statutes regulating prices have been declared invalid as a direct burden upon interstate commerce. Lemke v. Farmers' Grain Co., supra; Public Utilities Commission v. Attleboro Steam & Elec. Co., 273 U. S. 83, 47 S. Ct. 294, 71 L. Ed. 549; State of Missouri ex rel. Barrett v. Kansas Natural Gas Co., 265 U. S. 298, 44 S. Ct. 544, 68 L. Ed. 1027; Louisiana Public Service Commission v. Texas & N. O. R. Co., 284 U. S. 125, 52 S. Ct. 74, 76 L. Ed. 201; Baldwin v. Seelig, 55 S. Ct. 497, 501, 79 L. Ed. ——; Local 167, International Brotherhood of Teamsters v. United States, 291 U. S. 293, 54 S. Ct. 396, 78 L. Ed. 804. Compare Minnesota Rate Cases (Simpson v. Shepard), 230 U. S. 352, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18; Yee Hem v. United States, 268 U. S. 178, 45 S. Ct. 470, 69 L. Ed. 904; Di Santo v. Commonwealth of Pennsylvania, 273 U. S. 34, 47 S. Ct. 267, 71 L. Ed. 524.

■■■ While it is true that these cases concern state legislation, it is possible to derive from the opinions established rules

that are peculiarly apposite to the issues now before the court. The right to contract freely, without unreasonable restraint by government, is one of the fundamental liberties of the individual which is protected by the Fourteenth Amendment to the Constitution. Chas. Wolff Packing Co. v. Court of Industrial Relations, supra; Fairmont Creamery Co. v. State of Minnesota, supra; Yu Cong Eng v. Trinidad, 271 U. S. 500, 46 S. Ct. 619, 70 L. Ed. 1059; New State Ice Co. v. Liebmann, supra; In re Miner (D. C.) 9 F. Supp. 1, 7. This liberty is also secured by the Fifth Amendment. Adkins v. Children's Hospital, 261 U. S. 525, 43 S. Ct. 394, 396, 67 L. Ed. 785, 24 A. L. R. 1238.

In that case it is remarked "that the right to contract about one's affairs is a part of the liberty of the individual protected by this clause [due process clause of Fifth Amendment] is settled by the decisions of this court and is no longer open to question."

■ While the right to pursue a legitimate business is not absolute, but is subject to regulation with respect to the manner in which it shall be conducted, it does not follow that the power to regulate embraces the power to fix prices. Tyson & Brother United Theatre Ticket Offices v. Banton, supra.

In that case the court said that the "authority to regulate the conduct of a business or to require a license, comes from a branch of the police power which may be quite distinct from the power to fix prices. The latter, ordinarily, does not exist in respect of merely private property or business, Chesapeake & Potomac Tel. Co. v. Manning, 186 U. S. 238, 246, 22 S. Ct. 881, 46 L. Ed. 1144, but exists only where the business or the property involved has become 'affected with a public interest.' "

The court further observes: "The characterizations in some decisions of businesses as 'quasi public' (People v. King, 110 N. Y. 418, 428, 18 N. E. 245, 1 L. R. A. 293, 6 Am. St. Rep. 389), 'not "strictly" private' (Aaron v. Ward, 203 N. Y. 351, 356, 96 N. E. 736, 38 L. R. A. (N. S.) 204), and the like, while well enough for the purpose for which they were employed, namely, as a basis for upholding police regulations in respect of the conduct of particular businesses, cannot be accepted as equivalents for the description 'affected with a public interest,' as that phrase is used in the decisions of this court as the basis for legislative regulation of prices. The latter power is not only a more definite and serious invasion of the rights of property and the freedom of contract, but its exercise cannot always be justified by circumstances which have been held to justify legislative regulation of the manner in which a business shall be carried on.

"And, finally, the mere declaration by the Legislature that a particular kind of property or business is affected with a public interest is not conclusive upon the question of the validity of the regulation. The matter is one which is always open to judicial inquiry."

Until Nebbia v. New York, 291 U. S. 502, 54 S. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469, it had never been thought that the business of a milk dealer was one that could be subjected to state regulations to the extent of fixing the price which the dealer should pay for his milk.

I do not believe that Nebbia v. New York, supra, entirely overthrows earlier established principles, nor do I regard it as decisive in the instant case. The court there pointed out that the milk industry is one which, out of consideration of public health, had been properly subjected to extensive regulation and that a state, in the exercise of its police power, might, in an emergency created by economic conditions, deem the industry so far clothed with a public interest as to warrant regulation of prices paid producers. The question there was, whether the state was exercising an acknowledged police power in an unreasonable, arbitrary, or capricious manner, and whether the means selected had a real and substantial relation to the object to be attained. See note 5 to Railroad Retirement Board et al. v. Alton Railroad Co. et al., supra.

There have been other instances where emergencies have justified legislation respecting the price to be paid for the use of private property. Block v. Hirsh, 256 U. S. 135, 41 S. Ct. 458, 65 L. Ed. 865, 16 A. L. R. 165; Marcus Brown Holding Co. v. Feldman, 256 U. S. 170, 41 S. Ct. 465, 65 L. Ed. 877.

It does not follow that because a state may have, in the stress of emergency, police power to regulate a business essentially private in its character that the national government, under the commerce clause, has the same power. One is exercising a

granted power, and the other a reserved power. They are not to be measured by the same yardstick. Hart Coal Corporation v. Sparks (D. C.) 7 F. Supp. 16, 26.

■ Turning now to the powers granted to the legislative branch of the national government, we find that while the power of Congress to regulate commerce between the states is, within its proper sphere, supreme and plenary and acknowledges no limitation other than that prescribed in the Constitution (Minnesota Rate Cases, supra; Child Labor Tax Case [Bailey v. Drexel Furniture Co.], 259 U. S. 20, 42 S. Ct. 449, 66 L. Ed. 817, 21 A. L. R. 1432; Gibbons v. Ogden, 9 Wheat. 1, 196, 6 L. Ed. 23), these powers are not without their limitations (United States v. De Witt, 9 Wall. 41, 43, 19 L. Ed. 593; Franklin Process Co. v. Hoosac Mills Corporation, supra; United States v. Carolene Products Co. [D. C.] 7 F. Supp. 500).

In the De Witt Case the court observed: "But this express grant of power to regulate commerce among the States has always been understood as limited by its terms; and as a virtual denial of any power to interfere with the internal trade and business of the separate States."

One of the limitations to which the commerce power is subjected is the limitation imposed by the due process clause of the Fifth Amendment. Wilson v. New, 243 U. S. 332, 37 S. Ct. 298, 304, 61 L. Ed. 755, L. R. A. 1917E, 938, Ann. Cas. 1918A, 1024; United States v. Chicago, Milwaukee, St. Paul & Pac. R. Co., 282 U. S. 311, 51 S. Ct. 159, 75 L. Ed. 359; Nebbia v. New York, supra; Heiner v. Donnan, 285 U. S. 312, 52 S. Ct. 358, 76 L. Ed. 772; Calhoun v. Massie, 253 U. S. 170, 40 S. Ct. 474, 64 L. Ed. 843; United States v. Schechter (D. C.) 8 F. Supp. 136; Railroad Retirement Board et al. v. Alton Railroad Co., supra; United States v. Carolene Products Co., supra.

In Wilson v. New, supra, the court considered the Adamson Act (Act September 3, 5, 1916, c. 436, 39 Stat. 721, 45 USCA §§ 65, 66), which temporarily fixed the wages to be paid by railroads to employees. The regulation was justified upon the ground that the railroads were engaged in a business charged with a public interest entitling the public to the continuance of the service and that a serious calamity would result if the threatened strike of railroad employees should interrupt the service. In the course of his opinion, Chief Justice White said: "* * * Of course, it is always to be borne in mind that, as to both carrier and employee, the beneficent and ever-present safeguards of the Constitution are applicable, and therefore both are protected against confiscation and against every act of arbitrary power which, if given effect to, would amount to a denial of due process, or would be repugnant to any other constitutional right. And this emphasizes that there is no question here of purely private right, since the law is concerned only with those who are engaged in a business charged with a public interest, where the subject dealt with as to all the parties is one involved in that business, and which we have seen comes under the control of the right to regulate to the extent that the power to do so is appropriate or relevant to the business regulated."

United States v. Chicago, M., St. Paul & Pac. R. Co., supra, is another case dealing with the power of Congress to regulate common carriers. In that case the Interstate Commerce Commission, acting under authority of the Transportation Act of February 28, 1920 (section 439 [49 USCA § 20a]), attached a condition to an order approving an issue of securities by the railroad. This condition was held to be in excess of the power of Congress. Mr. Justice Sutherland, speaking for the court, 282 U. S. 311, at page 327, 51 S. Ct. 159, 163, 75 L. Ed. 359, said: "The power to regulate commerce is not absolute, but is subject to the limitations and guarantees of the Constitution (Const. Amend. 5), among which are those providing that private property shall not be taken for public use without just compensation and that no person shall be deprived of life, liberty or property without due process of law. Monongahela Navigation Co. v. United States, 148 U. S. 312, 336, 13 S. Ct. 622, 37 L. Ed. 463; United States v. Joint Traffic Association, 171 U. S. 505, 571, 572, 19 S. Ct. 25, 43 L. Ed. 259; Adair v. United States, 208 U. S. 161, 180, 28 S. Ct. 277, 52 L. Ed. 436, 13 Ann. Cas. 764. Both the liberty of contract and the right to property here are involved."

■ Another cardinal rule gathered from the authorities is that Congress may not, under the pretext of executing its granted powers, undertake the regulation of matters of local concern. McCulloch v. State of Maryland, 4 Wheat. 316, 4 L. Ed. 579.

█ If the declared or revealed purpose of the legislation is not to regulate commerce between the states in any true sense but is rather to regulate activities and transactions, or to attain ends which have no reasonable relation to such commerce, the act cannot stand as a valid exercise of the commerce power. Hammer v. Dagenhart, 247 U. S. 251, 38 S. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724; Hill v. Wallace, supra; Railroad Retirement Board et al. v. Alton Railroad Co. et al., supra; Royal Farms Dairy v. Wallace, supra; United States v. National Garment Co. (D. C.) 10 F. Supp. 104.

It is difficult to find any legitimate grounds for concluding that the price fixing conditions of the license will, under the factual situation presented, tend to maintain or conserve the free flow of commerce between the states. On the contrary, it has generally been supposed that regulation of prices paid for commodities moving in interstate commerce tended to burden such commerce. It is intimated in Baldwin v. Seelig, supra, that to fix the price paid for milk produced in one state and sold in another is to burden interstate commerce unduly though the legislation be enacted "in the faith that augmentation of prices will lift up the level of economic welfare." See Louisiana Public Service Commission v. Texas & N. O. R. Co., supra; Washington Water Power Co. v. City of Coeur D'Alene (D. C.) 9 F. Supp. 263, 268.

I do not overlook the decisions which deal with Acts of Congress which, to a greater or less extent, restrict the freedom of contract and regulate charges for services rendered. Obviously, legislation affecting the business of interstate carriers or of public utilities has no pertinency though, in the latest pronouncement of the Supreme Court, we learn that there are limits beyond which Congress cannot go in regulating the affairs of interstate carriers. Railroad Retirement Board et al. v. Alton Railroad Co., supra.

█ By the Grain Futures Act of September 21, 1922 (42 Stat. 998, 7 USCA §§ 1–17), and the Packers and Stockyards Act of August 15, 1921 (7 USCA c. 9, § 181 et seq.), Congress has exerted regulatory powers upon the business of grain brokers, of meat packers, and of conducting stockyards. The former act was upheld in Board of Trade of City of Chicago v. Olsen, 262 U. S. 1, 43 S. Ct. 470, 67 L. Ed. 839, and the latter in Stafford v. Wallace, supra, and Tagg Bros. & Moorhead v. United States, 280 U. S. 420, 50 S. Ct. 220, 74 L. Ed. 524. The Grain Futures Act could hardly be called a price fixing act. Its evident aim was to control prices and prevent unreasonable manipulation of market prices for grain. In the Stockyards Act, the Secretary of Agriculture was empowered, after notice and hearing, to reject schedules of charges and establish a proper schedule. It is quite apparent from the decisions that warrant for these regulations lay in the monopolistic character of the businesses and the danger that those engaged in them, by means of monopoly, would unreasonably manipulate prices, or arbitrarily impose exorbitant charges and resort to other practices which the statute aimed to prevent and which, if not prevented, would operate to hamper and interrupt the free flow of commerce. It is readily seen that this legislation and the adjudications upon it involved factual situations easily distinguished from that of the cases at bar. Here there is no finding of monopoly, of unfair practices, or any ground for apprehending that the defendants can or will resort to practices that will operate to hamper or impede the current of commerce between the states. The conclusion follows, I think, that the time has not yet come when an administrative officer can, by recourse to the commerce clause of the Constitution, regiment the production or control the price of a common commodity in the absence of any express statutory authority or any showing that unfettered freedom to produce or to contract operates to obstruct the free flow of interstate commerce. The weight of authority is that no constitutional basis exists for such regimentation of the milk industry. Mugler v. State of Kansas, 123 U. S. 623, 8 S. Ct. 273, 31 L. Ed. 205; Hammer v. Dagenhart, supra; Railroad Retirement Board et al. v. Alton Railroad Co., supra.

It is argued by the government that dicta in Lemke v. Farmers' Grain Co., supra, and Shafer v. Farmers' Grain Co., supra, support the contention that Congress is fully authorized to fix the price to be paid for any commodity moving in interstate commerce. I am not convinced by this argument. Its cogency was doubted in Royal Farms Dairy v. Wallace, supra.

The declaration of policy and declaration of emergency which preface the Agricultural Adjustment Act cannot operate to add to the power of the Congress. Home Bldg. & Loan Ass'n v. Blaisdell, 290 U. S. 398, 54 S. Ct. 231, 78 L. Ed. 413, 88 A. L. R. 1481; Ex parte Milligan, 4 Wall. 2, 18 L. Ed. 281; United States v. Suburban Motor Service Corporation (D. C.) 5 F. Supp. 798; Penn et al. v. Glenn et al. (D. C. W. D. Ky.) 10 F. Supp. 483, decided April 13, 1935.

While economic disturbances may actuate latent power, the obvious attempt to augment the commerce powers by recourse to existing economic conditions prevailing in agricultural and other industries is not only repugnant to all concepts of dual sovereignty, but has almost unanimously been condemned by the courts which have had occasion to deal with the application of the Agricultural Adjustment Act and of the companion act (48 Stat. 195) designed to regulate industries other than agriculture. For cases involving the Agricultural Adjustment Act, see: Berdie et al. v. Kurtz, supra; Edgewater Dairy Co. v. Wallace, supra; Hill v. Darger et al., supra; United States v. Greenwood Dairy Farms, supra; Douglas v. Wallace, supra; United States v. Neuendorf, supra; Columbus Milk Producers' Co-op. Ass'n v. Wallace, supra; and for cases involving the National Industrial Recovery Act, see: Hart Coal Corporation v. Sparks, supra; United States v. Gearhart (D. C.) 7 F. Supp. 712; Irma Hat Co. v. Local Retail Code Authority (D. C.) 7 F. Supp. 687; United States v. Mills (D. C.) 7 F. Supp. 547; United States v. Suburban Motor Service Corporation, supra; Purvis v. Bazemore (D. C.) 5 F. Supp. 230; Washington Water Power Co. v. City of Coeur D'Alene, supra; Table Supply Stores, Inc., v. Hawking (D. C.) 9 F. Supp. 888; United States v. Superior Products, Inc. (D. C.) 9 F. Supp. 943, 946; United States v. National Garment Co., supra.

Conceding that a nation-wide economic disturbance might operate to create a relationship between legislative purposes and interstate commerce which would not otherwise exist, I am unable to discern any ground for thinking that the facts before the court in the instant cases are sufficient to bring the production or price of milk within the ambit of the commerce powers of the United States.

There are other particulars to be found in the license which may be deemed to be in contravention of the due process clause of the Fifth Amendment. So far as the record discloses, the Secretary has assumed unrestricted authority to fix any price he sees fit without any opportunity extended to producers or distributors to be heard in objection. Again, by its terms the license compels the distributor, against his will, to share his profits with other distributors. This provision is of doubtful propriety in view of Railroad Retirement Board et al. v. Alton Railroad Co., supra.

Whether these features of the license are authorized as necessary to eliminate unfair practices, it is not necessary to decide in view of the above conclusion.

To summarize: The license must be held to be void and unenforceable for the reasons (a) that it purports to operate upon persons not within the reach of the authority conferred upon the Secretary of Agriculture by the statute; (b) that its scope has been carried beyond the limits of the law by regimenting production and fixing prices with respect to transactions that have no substantial or direct relation to interstate commerce; and (c) that these excesses, found in inseparable provisions of the license, vitiate the whole license.

The bills of complaint in both of the cases here considered must be dismissed.